MARILYN SEIGEL SHEESKIN, Personal
Representative of the Estate of Nathan
Seigel v. GIANT FOOD, INC. et al.

[No. 421, September Term, 1973.]

*Decided April 17, 1974.*

612

The cause was argued before POWERS, DAVIDSON and MOORE, JJ.

*Linda Schwartz*, with whom were *Jacob Sheeskin, Robert.*

*E. Reiver* and *Sheeskin & Hillman* on the brief, for appellant.

*William N. Rogers* and *Albert D. Brault*, with whom were *Carr, Bonner, O'Connell, Kaplan, Thompson & Diuguid* on the brief, for appellees.

DAVIDSON, J., delivered the opinion of the Court.

Every Friday for over two years Nathan Seigel, age 73, shopped with his wife at a Giant Food Store. This complex products liability case is before us because on one of these Fridays, 23 October 1970, Mr. Seigel was carrying a six-pack carton of Coca Cola from a display bin at the Giant to a shopping cart when one or more of the bottles exploded. Mr. Seigel lost his footing, fell to the floor and was injured.

In the Circuit Court for Montgomery County, Mr. Seigel sued both the Giant Food, Inc., and the Washington Coca Cola Bottling Company, Inc., for damages resulting from their alleged negligence and breach of an implied warranty. At the conclusion of the trial Judge Walter H. Moorman directed a verdict in favor of each defendant.

Mr. Seigel appealed to the Court of Appeals. On 11 October 1972 that Court remanded the case for further proceedings without affirmance or reversal. In a per curiam opinion the Court said:

> "At the conclusion of all the evidence, the lower court, with considerable reluctance, granted Giant's **and Coca Cola's motions for directed verdicts in their favor, on the theory that Uniform Commercial Code (UCC) § 2-314, Maryland Code (1957, 1964** Repl. Vol.) Art. 95B, § 2-314 postulated a breach of implied warranty only upon a completed sale to Seigel and that *res ipsa loquitur* was inapplicable. Unfortunately, the attention of the court seems not to have been invited by the plaintiff either to UCC § 2-318, Code Art. 95B, § 2-318, as amended by Ch. 249 of the Laws of 1969, which now provides that under certain circumstances a warranty may be

implied in the absence of privity of contract or to *Leikach v. Royal Crown*, 261 Md. 541, 276 A. 2d 81 (1971), in which this Court recognized for the first time that there may be factual situations involving exploding bottles where *res ipsa loquitur* may be invoked. It may well be that additional testimony will be required to determine whether there was or was not a sale by Coca Cola to Giant and to ascertain whether there is evidence that the three criteria necessary for reliance on *res ipsa loquitur*, *Leikach, supra*, at 547 are present. Accordingly, we shall remand the case to the trial court without affirmance or reversal for further proceedings."

Further proceedings were had before Judge David L. Cahoon who permitted appellant to reopen his case. Mr. Seigel produced additional evidence in the form of a stipulation that prior to Mr. Seigel's injury the Washington Coca Cola Bottling Company, Inc., sold to the Giant Food, Inc., the bottles of Coca Cola which Mr. Seigel ultimately selected. No additional testimony was adduced on the issue of the applicability of res ipsa loquitur under the standards set forth in *Leikach*. The defendants renewed their motions for directed verdicts. After review and consideration of the memoranda and oral arguments of the parties, Judge Cahoon granted the motions. His order was filed on 16 July 1973. Mr. Seigel appealed to this Court.

I

Applicability of Res Ipsa Loquitur

Appellant contends that the doctrine of res ipsa loquitur is applicable. He maintains that since the evidence shows that the possibility of damage to the bottles by a customer at the Giant is remote, his injury must have been caused either by the negligence of the bottler, Washington Coca Cola Bottling Co., Inc. or by the negligence of the retailer, Giant Food, Inc. He concludes that res ipsa loquitur applies and that he is entitled to have the jury pass on his claim.

In *Joffre v. Canada Dry, Inc.*, 222 Md. 1, 8-9, 158 A. 2d 631,

635 (1960), the Court of Appeals specifically rejected the view that evidence of the explosion of a bottle of carbonated beverage in a store, without more, requires both the bottler and the retailer to go forward and produce evidence exonerating themselves from responsibility. The Court said:

> "The Maryland rule is that if plaintiff offers evidence which raises two or more inferences of the cause of the harm (or negligence), for only one of which the defendant is responsible, no cause of action is made out. The test is applicable in situations in which *res ipsa loquitur* may be applicable. In such instances the plaintiff must show that the thing that caused the injury was in the exclusive control of the defendant. . . .
>
> "The cases from other jurisdictions which have permitted the inference of negligence of the bottler from the exploding of a bottle most often have been those where the probability of an intervening cause of the breaking has been excluded by the testimony for the plaintiff." (Citations omitted.)

Thus the Court established that in order to invoke the doctrine of res ipsa loquitur the plaintiff must produce evidence sufficient to show that his injury was probably caused by conditions within the exclusive control of a given defendant. Under *Joffre*, exclusive control in a given defendant could be shown only by evidence which excluded all possibilities as to the probable cause of plaintiff's harm other than those in the control of the particular defendant.

In *Leikach v. Royal Crown*, 261 Md. 541, 547-48, 276 A. 2d 81, 84 (1971), the Court of Appeals reiterated the three criteria enunciated in *Munzert v. American Stores*, 232 Md. 97, 104, 192 A. 2d 59, 63 (1963), for successful reliance on the doctrine of res ipsa loquitur:

> "1. A casualty of a sort which usually does not occur in the absence of negligence.
> "2. Caused by an instrumentality within the defendant's exclusive control.

"3. Under circumstances indicating that the casualty did not result from the act or omission of the plaintiff."

In explicating the meaning of the term "exclusive control" the Court said:

"[T]he criterion of 'exclusive control' in the area of exploding soda bottles is not applied literally for, if it were, there could hardly, if ever, be a recovery. As 2 *Harper and James, The Law of Torts* put it in § 19.7, pp. 1086-1087:

'The requirement as it is generally applied is more accurately stated as one that the evidence must afford a rational basis for concluding that the cause of the accident was probably "such that the defendant would be responsible for any negligence [such as, in the present case, (1) defects in the bottle, (2) defects caused by improper handling of the bottle, or (3) excessive carbonation] connected with it." That does not mean that the possibility of other causes must be altogether eliminated, but only that their likelihood must be so reduced that the greater probability lies at defendant's door.' " 261 Md. at 548, 276 A. 2d at 84-85.

The Court then specifically held:

"*[T]he burden of a plaintiff who relies on res ipsa loquitur in an exploding bottle case* does not include the exclusion of every possible cause of injury other than that of the bottler's negligence, but *does include the proving that there is a greater likelihood that injury was caused by the defendant's negligence than by some other cause* . . . ." (Emphasis added.) 261 Md. at 550, 276 A. 2d at 86.

Thus the Court retreated from the stringent standard earlier enunciated in *Joffre* concerning the applicability of res ipsa loquitur.

In applying the principles of *Leikach* to the instant case we must consider the claimant's evidence and all inferences that permissibly can be drawn from that evidence in the light most favorable to the claimant. *Leikach, supra,* 261 Md. at 545, 276 A. 2d at 83; *Short v. Wells,* 249 Md. 491, 495, 240 A. 2d 224, 227 (1968); *Beach v. Woodward & Lothrop, Inc.,* 18 Md. App. 645, 649, 308 A. 2d 439, 441 (1973); *Buchanan v. Galliher and Harless,* 11 Md. App. 83, 87-88, 272 A. 2d 814, 816-17 (1971). At the trial Mr. Seigel testified that he intended to buy a six-pack carton of Coca Cola containing 16-ounce returnable bottles. He stated that the cartons from which he selected his six-pack were stacked in the display bin in the usual fashion: four cartons deep and five or six cartons high with sheets of self-retracting plastic forming shelves to separate the cartons vertically. The cardboard carton of the six-pack he selected was not defective in any way. There was no liquid around him or the bottles as he reached to remove the six-pack. There were no other people nearby. He did not have to reach very high to place four fingers of his right hand through both handles of a six-pack located near the top of the stack. As he lifted the carton and took it out of the bin it neither touched nor was touched by anything other than his hand. No other bottles of soft drinks fell. When he had taken three or four steps toward his shopping cart "there was an explosion, a loud explosion and it knocked the carton out of my hand completely, there was such force to it. I tried to move and the Coca Cola was all over the floor and I couldn't get any traction with my feet because it was slippery. As I tried to go forward I couldn't, and I fell." The manager of the Giant testified that three or four bottles were broken; that no effort was made to examine any of them; and that the broken glass was swept up by his employees and not retained.

It is apparent from the record before us that the first test for the successful application of res ipsa loquitur is satisfied. Moreover, Mr. Seigel's testimony as to the circumstances surrounding his removal of the carton of Coca Cola from the shelf satisfies the third test. As in *Leikach,* the question with which we are here confronted is the "exclusive control" exercised by each defendant. Under the standard established

in *Leikach* we must determine whether there was sufficient evidence to show a greater likelihood that injury was caused by the negligence of the bottler rather than the retailer, or vice versa, and by one of these two rather than by some other cause.

Here there was uncontradicted evidence to show that there are three primary causes for a Coca Cola bottle to explode: a manufacturing defect, a thermal shock or an impact break resulting from mishandling. With respect to the likelihood that Mr. Seigel's injury was caused by the negligence of the bottler, there was evidence to show that Washington Coca Cola Bottling Company, Inc., buys bottles **from several different manufacturers.** All of the bottles purchased are manufactured in accordance with standards set by the National Soft Drink Association. All of the bottles are visually and electronically inspected in order to detect defects and defective bottles which escape detection would, in any event, break when subjected to pressurization. Between 1967 and 1970 the bottler produced a total of 288,000,000 bottles and received only eleven complaints concerning bottles which exploded. In the absence of any affirmative showing of the existence of a manufacturing defect in the bottles which exploded in Mr. Seigel's hand, this evidence supports an inference that it was highly unlikely that a manufacturing defect caused the bottles here involved to explode. There was evidence to show that once filled the bottles were stored by the bottler in a ventilated but non-refrigerated area and were delivered in non-refrigerated trucks. There was also evidence that the filled bottles were stored by the bottler for a maximum period of two weeks prior to their delivery and that the bottles here involved were delivered on either 19 or 21 October 1970. The evidence that storage and delivery of the bottles occurred in and was confined to the month of October 1970, in the absence of any evidence as to unusually high temperatures during that month, negates the possibility that thermal shock during the period of time in which the bottler controlled the bottles caused the explosion which resulted in injury to Mr. Seigel and supports an inference to

the contrary. Finally, there was evidence to show that the bottles are moved by machine throughout the entire bottling process, from the unloading of the bottles when delivered by the manufacturer to the bottling company, through the washing, sterilization, inspection, pressurization, filling, capping and ultimate packaging in cardboard cartons, each containing six bottles of Coca Cola, and then in wooden cases, each containing four six-packs. The bottles are delivered in trucks especially designed to avoid the possibility of impact damage during transit. The only time the Cokes are handled non-mechanically is when the bottler's employee removes the wooden cases from the bottler's truck, stacks them four or five high on a hand truck, carries them from the rear of the retailer's store to the aisle in which they are to be displayed, and stamps the price upon the cardboard cartons, not the bottles. All of this evidence supports an inference that the possibility of impact damage resulting from mishandling by the bottler is essentially limited to the period of time within which the bottles are carried from the truck to the aisle of the retailer's store.

With respect to the retailer, the evidence shows that the bottles delivered to him during October 1970 were stored for a maximum of five days in an area kept at a constant temperature of 72°. This evidence totally eliminates the possibility that the explosion was caused by thermal shock during the period of time in which the bottles were controlled by the retailer. There was further evidence to show that once delivered to the appropriate aisle at the retailer's, the cartons of Coca Cola were removed from their wooden cases and stacked on the shelves by the retailer's employees; that during the two to five days in which they remained on the shelf they might have been periodically rearranged and restacked by the retailer's employees; and that cartons which might have been abandoned by customers at various locations throughout the store would have been returned to the shelves by the retailer's employees. This evidence not only supports the inference that there was a substantial likelihood of impact damage resulting

from mishandling by the retailer's employees during the period within which the bottles were in the retailer's control, but also the further inference that because the opportunities for mishandling by the retailer were considerably more extensive than those of the bottler, there was a greater likelihood that Mr. Seigel's injuries were caused by the negligence of the retailer than by any cause within the control of the bottler.

Finally, there was evidence to show that the Giant is a self-service store in which the only way a customer can buy anything is to select it himself. There are occasions when a customer may select an item in the store, then change his mind and put the item back. Customers generally do not change their minds about purchasing Coca Cola after they have removed a carton from the shelf, but when such a change of mind does occur, the customers "never" or "hardly ever" replace the carton on the shelf from which it was removed. The cartons abandoned by customers will be found in various places around the store, such as on the freezers, the floor or other counters. This evidence reduces the likelihood that impact damage occurred to the particular bottles selected by Mr. Seigel as a result of mishandling by customers, and supports an inference that as between the customer and the retailer the greater probability of negligence lies with the retailer.

On the basis of the record before us we are convinced that the evidence was sufficient to show a greater likelihood that Mr. Seigel's injury was caused by the retailer's negligence rather than by some other cause. Having met his burden of proof, appellant was entitled to have res ipsa loquitur applied and to have the jury pass on the question of Giant's negligence. Accordingly, we will reverse the judgment in favor of the retailer, Giant Food, Inc., as to negligence, and affirm the judgment in favor of the bottler, The Washington Coca Cola Bottling Company, Inc., as to negligence.

II

Breach of Warranty

In an action based on breach of warranty it is necessary

for the plaintiff to show the existence of the warranty, the fact that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained. Code (1957), Art. 95B, § 2-314, Official Comment 13; [1] *see Erdman v. Johnson Brothers*, 260 Md. 190, 195, 271 A. 2d 744, 746 (1970); *cf. Twombley v. Fuller Brush Co.*, 221 Md. 476, 491, 158 A. 2d 110, 118 (1960). Appellant contends that the evidence was sufficient to establish each of these three elements with respect to both the retailer and the bottler. The retailer contends that appellant failed to show the existence of a warranty from Giant Food, Inc., to appellant while the bottler contends that appellant failed to show that its warranty was breached.

## A. The Retailer

The retailer, Giant Food, Inc., contends that appellant failed to prove that an implied warranty existed between himself and the retailer because he failed to prove that there was a sale by the retailer to him or a contract of sale between the two. The retailer maintains that there was no sale or contract of sale because at the time the bottles exploded Mr. Seigel had not yet paid for them. We do not agree.

Code (1957), Art. 95B, § 2-314 (1) states in pertinent part:

"Unless excluded or modified (§ 2-316), a warranty that the goods shall be merchantable is implied *in a contract for their sale* if the seller is a merchant with respect to goods of that kind." (Emphasis added.)

Thus, in order for the implied warranties of § 2-314 to be applicable there must be a "contract for sale." In Maryland it has been recognized that neither a completed "sale" nor a fully executed contract for sale is required. It is enough that there be in existence an executory contract for sale. *See Fred*

1. The Uniform Commercial Code, effective in Maryland on 1 February 1964, is codified in Art. 95B of the 1957 Code. 1963 Laws of Maryland, Ch. 538, § 3.

*J. Miller, Inc. v. Raymond Co.*, 265 Md. 523, 527-28, 290 A. 2d 527, 529-30 (1972).

In *Buffalo Steel Co. v. Kirwan*, 138 Md. 60, 64, 113 A. 628, 630 (1921), the Court of Appeals defined the term "contract" as follows:

> "A contract has been defined as an 'agreement which creates an obligation.' 13 *C. J.* 237, and such an agreement may be defined as the concurrence of two or more persons in a common intent to affect their legal relations, and for the purposes of this case these definitions may be taken as sufficiently accurate. The agreement referred to must rest finally upon an offer made by one party and the acceptance thereof by the other party to that contract. *Brantly, Contracts*, par. 7. An 'offer is a proposal to enter into a contract' (13 *C. J.* 266, also *Bouvier*), and an acceptance is the assent of the party to whom the offer is addressed to its terms. The offer must be certain and definite and the acceptance must 'in every respect meet and correspond with the offer.' 13 *C. J.* 278; *Brantly, Contracts*, par. 9. That is to say both parties to the contract 'must actually give their assent to that proposal and acceptance, be it what it may, which *de facto* arise out of the terms of their communications.' 1 *Elliott, Contracts*, par. 26."

Code (1957), Art. 95B, § 2-106 (1) provides in pertinent part:

> "In this subtitle . . . . 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time. A 'sale' consists in the passing of title from the seller to the buyer for a price (§ 2-401). A 'present sale' means a sale which is accomplished by the making of the contract."

The terms of the statute are clear and unambiguous and are its best expositor. *Shay v. Joseph*, 219 Md. 273, 275, 149 A. 2d 3, 4 (1959). These provisions establish that:

1. There are three essential elements which characterize a transaction as a "sale":

   a. Title must pass from one party to another;

   b. the subject of the transaction must be "goods," that is, "all things . . . which are movable at the time of identification to the contract . . . .";[2] and

   c. a price must be paid.[3]

2. A contract for the sale of goods is an agreement between the parties that one will transfer title to the goods to the other for a price.

3. A contract for the sale of goods can involve either an agreement to transfer title to goods for a price at the time the agreement is made or an agreement to transfer the title to the goods for a price at a time subsequent to that at which the agreement is made.[4]

Here, the plaintiff has the burden of showing the existence of the warranty by establishing that at the time the bottles exploded there was a contract for their sale existing between himself and the Giant. *Twombley v. Fuller Brush Co., supra; Shay v. Joseph, supra.* Mr. Titus, the manager of the Giant, testified that the retailer is a "self-service" store in which "the only way a customer can buy anything is to select it

---

2. Code (1957), Art. 95B, § 2-105 (1).

3. Bailments and leases are transactions in which title does not pass. Therefore the implied warranties of § 2-314 are inapplicable. Bona v. Graefe, 264 Md. 69, 72-73, 285 A. 2d 607, 609 (1972). Because transactions in which title to real property passes for a price do not involve movable things, the implied warranties of § 2-314 do not arise. Worthington Constr. v. Moore, 266 Md. 19, 21-22, 291 A. 2d 466, 467 (1972); Smith v. Millwood Constr. Corp., 260 Md. 319, 323, 272 A. 2d 19, 21 (1971); Neary v. Posner, 253 Md. 401, 405, 252 A. 2d 843, 846 (1969); Thomas v. Cryer, 251 Md. 725, 726-27, 248 A. 2d 795, 795-96 (1969); Allen v. Wilkinson, 250 Md. 395, 398, 243 A. 2d 515, 517 (1968). Implied warranties are not applicable to gifts because these transactions, while they may involve the passing of title to movable things, do not require that a price be paid.

4. Official Comment 1 to § 2-106 (1) states:

" 'Contract for sale' is used as a general concept throughout this Subtitle, but the rights of the parties do not vary according to whether the transaction is a present sale or a contract to sell unless the Subtitle expressly so provides."

himself and take it to the checkout counter." He stated that there are occasions when a customer may select an item in the store and then change his mind and put the item back. There was no evidence to show that the retailer ever refused to sell an item to a customer once it had been selected by him or that the retailer did not consider himself bound to sell an item to the customer after the item had been selected. Finally, Mr. Titus said that an employee of Giant placed the six-pack of Coca Cola selected by Mr. Seigel on the shelf with the purchase price already stamped upon it. Mr. Seigel testified that he picked up the six-pack with the intent to purchase it.

We think that there is sufficient evidence to show that the retailer's act of placing the bottles upon the shelf with the price stamped upon the six-pack in which they were contained manifested an intent to offer them for sale, the terms of the offer being that it would pass title to the goods when Mr. Seigel presented them at the check-out counter and paid the stated price in cash. We also think that the evidence is sufficient to show that Mr. Seigel's act of taking physical possession of the goods with the intent to purchase them manifested an intent to accept the offer and a promise to take them to the check-out counter and pay for them there.

Code (1957), Art. 95B, § 2-206 provides in pertinent part:

"(1) Unless otherwise unambiguously indicated by the language or circumstances

(a) An offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances . . . ."

The Official Comment 1 to this section states:

"Any reasonable manner of acceptance is intended to be regarded as available unless the offeror has made quite clear that it will not be acceptable."

In our view the manner by which acceptance was to be

accomplished in the transaction herein involved was not indicated by either language or circumstances. The seller did not make it clear that acceptance could not be accomplished by a promise rather than an act. Thus it is equally reasonable under the terms of this specific offer that acceptance could be accomplished in any of three ways: 1) by the act of delivering the goods to the check-out counter and paying for them; 2) by the promise to pay for the goods as evidenced by their physical delivery to the check-out counter; and 3) by the promise to deliver the goods to the check-out counter and to pay for them there as evidenced by taking physical possession of the goods by their removal from the shelf.

The fact that customers, having once selected goods with the intent to purchase them, are permitted by the seller to return them to the shelves does not preclude the possibility that a selection of the goods, as evidenced by taking physical possession of them, could constitute a reasonable mode of acceptance. Section 2-106 (3) provides:

> " 'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On 'termination' all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives."

Here the evidence that the retailer permits the customer to "change his mind" indicates only an agreement between the parties to permit the consumer to end his contract with the retailer irrespective of a breach of the agreement by the retailer. It does not indicate that an agreement does not exist prior to the exercise of this option by the consumer.

Moreover, the absence of evidence to show that the retailer ever refused to sell an item to a customer once it had been selected by him or that the retailer did not consider himself bound to sell an item to a customer after the customer had made a selection supports an inference that the selection of the goods, as evidenced by the consumer's

taking physical possession of them, could constitute a reasonable mode of acceptance. We believe that under the circumstances surrounding this transaction reasonable men could conclude that Mr. Seigel's act of taking physical possession of the goods with the intent to pay for them constituted a reasonable mode of acceptance; that at that moment a contract for the sale of the goods (that is, a bilateral executory agreement to transfer title to the goods for a price) came into being; and that from that moment forward the implied warranties of Code (1957), Art. 95B, § 2-314 were applicable. *Accord, Day v. Grand Union Co.*, 280 App. Div. 253, 113 N.Y.S.2d 436, 439 (1952) (Brewster, J., concurring); *Sanchez-Lopez v. Fedco Food Corp.*, 211 N.Y.S.2d 953, 956-57 (N.Y. City Court 1961).

Courts in three states have reached an apparently contrary result. *Lasky v. Economy Grocery Stores*, 319 Mass. 224, 65 N.E.2d 305, 306 (1946); *Loch v. Confair*, 361 Pa. 158, 63 A. 2d 24, 27 (1949); *Day v. Grand Union Co.*, 280 App. Div. 253, 113 N.Y.S.2d 436, 437 (1952). All three of these cases however, were decided prior to the adoption of the Uniform Commercial Code in their respective states. Inherent in the rationale of each of these cases is the classical concept that the legal consequences flowing from a contract for sale or a sale are determined by the time title passes or is to pass. In each of the cases no agreement was found to exist because, in the court's view, the seller "did not intend to part with the title until the price was paid." *Lasky, supra.*

In *Wilke, Inc. v. Cummins Diesel*, 252 Md. 611, 615-16, 250 A. 2d 886, 889 (1969), the Court of Appeals said:

"One of the more startling differences between the U.C.C. and the Sales Act is the U.C.C.'s adoption of a flexible contractual approach instead of following the more rigid concept of title to which the Sales Act adhered.

"The Official Comment to U.C.C. § 2-101, the first section in the Subtitle on Sales, puts it this way:

'The arrangement of the present Subtitle is in terms of contract for sale and the various steps of its performance. The legal consequences are stated as following directly from the contract and action taken under it without resorting to the idea of when property or title passed or was to pass as being the determining factor. *The purpose is to avoid making practical issues between practical men turn upon the location of an intangible something, the passing of which no man can prove by evidence and to substitute for such abstractions proof of words and actions of a tangible character.'* (Emphasis added.)

"Hawkland, *A Transactional Guide to the Uniform Commercial Code* (1964), goes somewhat further:

'Under the U.C.C. the location of title is relatively unimportant, because the Code rejects the "lump-concept approach" of the common law and the U.S.A. [Uniform Sales Act]. At common law and under the U.S.A. the approach was to decide under the specific facts of a case that the "title" was in the seller or the buyer, a "wide-premise decision," which then dictated the answers to many unrelated problems, such as risk of loss, liability for price as against mere damages, liability for taxes, standing to sue third party tort feasors, and the like. A decision on title in one case was authority for a decision on title in another, even though the particular issues to be decided in the two cases were radically different.

'The U.C.C. has adopted the policy of "narrow-issue" thinking. A number of specific rules govern the rights and duties of the buyer and seller, and often these provisions are not predicated upon ownership considerations.

> *Under the U.C.C., the analysis of a sales problem does not start with a location of title, but with an analysis of the problem in terms of narrow issues and an ascertainment of whether or not the U.C.C. contains specific provisions dealing with these issues. If it does, those rules govern the transaction, and title will play no part in its solution.* If it does not, the title concept may still be employed.' (Emphasis added) Hawkland, *supra*, § 1.2401 at 143." (Citations omitted.)

We believe that our analysis, which is limited to the narrow issues of offer and acceptance as dealt with by specific provisions of Article 95B, is consonant with the policy of "narrow issue thinking" characteristic of the Uniform Commercial Code.

In *Gillispie v. The Great Atlantic and Pacific Tea Company*, 14 N. C. App. 1, 187 S.E.2d 441 (1972), the Court of Appeals of North Carolina, the only other court to consider the question of the nature of a transaction at a self-service store under the Uniform Commercial Code, concluded, as do we, that an implied warranty arises when a customer takes physical possession of goods with the intent to purchase them. That conclusion was premised on the concept that under the Uniform Commercial Code a sale consists in the passing of title from the seller to the buyer for a price, § 2-106 (1), and that unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods. § 2-401 (2). We reject this reasoning because we believe that the question of whether a contract for sale exists is not dependent upon the passage of title. Moreover, we believe that § 2-401 (2) is applicable only in cases in which a seller has a duty to deliver goods somewhere other than his own place of business.[5] Because a

---

**5.** Sections 2-401 (2)(a) and (b) of the Code state:

"(a) If the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at

self-service store transaction takes place entirely within the seller's place of business, we believe the applicable provision is § 2-401 (3)(b), which provides that if the goods are already identified at the time of contracting and no documents are to be delivered, title passes at the time and place of contracting. In order to determine when title passes under this provision, it is necessary to determine when the contract was made, an issue which in turn depends upon whether an offer and acceptance has occurred in accordance with the applicable provisions of the Uniform Commercial Code.

Appellant contends that the evidence was sufficient to show that the retailer breached an implied warranty of merchantability [6] and that he suffered loss as a result of that breach. We agree.

It is axiomatic that a buyer may recover for breach of warranty without proving negligence on the part of the seller. 2 Frumer and Friedman, *Products Liability*, § 16.01 (1) at 3-4 (1973); 1 Hursh, *American Law of Products Liability*, § 3.1 at 407-08 (1961); Prosser, *Handbook of the Law of Torts*, § 95 at 617-18 (3d ed. 1964); 1 *Williston on*

---

destination, title passes to the buyer at the time and place of shipment; but

"(b) If the contract requires delivery at destination, title passes on tender there."

**6.** Code (1957), Art. 95B, §§ 2-314 (2)(c) and 2-314 (2)(e) provide that goods to be merchantable, must be at least such as (c) "are fit for the ordinary purposes for which such goods are used," and (e) "are adequately contained, packaged and labeled as the agreement may require." Official Comment 10 states that paragraph (e) "applies only where the nature of the goods and of the transaction requires a certain type of container, package or label."

Under the Uniform Sales Act the Court of Appeals had held that an implied warranty did not extend to the carton or box in which the warranted item was packaged. Poplar v. Hochschild, Kohn & Co., 180 Md. 389, 393-94, 24 A. 2d 783, 785 (1942); *see* Atwell v. Pepsi Cola Bottling Co. of Washington, D.C., 152 A. 2d 196, 198 (D.C. Mun. App. 1959). Neither the bottler nor the retailer in this case defended on the ground that the implied warranty for fitness did not extend to the bottles. It is obvious that the nature of bottled carbonated drinks such as Coca Cola requires a container which is adequate to contain the drink without breaking or exploding when handled with ordinary care. Bottled soft drinks are not marketable if inadequately contained. Suffice it to say that given the express terms of § 2-314 (e) the bottler and retailer were correct in not interposing such a defense. 1 Hawkland, *A Transactional Guide to the Uniform Commercial Code*, § 1.19020703 at 69 (1964).

*Sales,* § 237 at 617 (Rev. ed. 1948). In order to recover on a warranty, the plaintiff need show only that the article sold did not conform to the representation of the warranty at the time it left the control of the defendant. 1 *Anderson on the Uniform Commercial Code,* § 2-314:9 at 532-33 (2d ed. 1970); Hursh, *American Law of Products Liability,* § 1:14 at 25-28 (1961); *Anno., Products Liability,* 78 A.L.R.2d 594, 618-20 (1961).[7]

Here Mr. Seigel testified that all of the circumstances surrounding his selection of the bottles were normal; that the carton in which the bottles came was not defective; that in lifting the carton from the shelf and moving it toward his basket the bottles neither touched nor were touched by anything other than his hand; that they exploded almost instantaneously after he removed them from the shelf; and that as a result of the explosion he fell injuring himself. It is obvious that Coca Cola bottles which would break under normal handling are not fit for the ordinary use for which they were intended and that the relinquishment of physical control of such a defective bottle to a consumer constitutes a breach of warranty. Thus the evidence was sufficient to show that when the bottles left the retailer's control they did not conform to the representations of the warranty of merchantability, and that this breach of the warranty was

---

7. The Court of Appeals has held that in an action on an express or implied warranty it is incumbent on the plaintiff to prove the unsoundness of the article at the time of the sale. Hacker v. Shofer, 251 Md. 672, 676-77, 248 A. 2d 351, 354 (1968); Great Atlantic and Pacific Tea Co. v. Adams, 213 Md. 521, 526, 132 A. 2d 484, 488 (1957); McCeney v. Duvall, 21 Md. 166, 185-86 (1864); Fenwick v. Forrest, 5 H. & J. 414, 416-17 (1822). In each of these cases, all previous to the adoption of the Uniform Commercial Code, the Court was considering situations in which recovery was sought for a defect discovered after a sale had been fully executed by way of passage of title, delivery of the goods and payment of the price. None of these cases precludes the adoption of the more generalized rule, stated above, which has been espoused by text writers and followed by virtually all of the state courts which have considered the question. The more generalized rule is equally applicable to situations in which recovery is sought against an immediate seller under a contract of sale in which some of the terms of the agreement may not have been fully executed at the time the physical control of the goods was transferred from the seller to the buyer, and to those in which recovery is sought against a party more remote than the immediate seller. *See* discussion below at 25; Keeton, *Products Liability — Liability Without Fault and the Requirement of a Defect,* 41 Texas L. Rev. 855, 858 (1963).

the cause of the loss sustained. Having made this *prima facie* showing, appellant was entitled to have the jury pass upon the questions of whether the warranty was breached, and if so, whether the breach caused his injury. Accordingly, we will reverse the judgment in favor of the retailer, Giant Food, Inc., as to breach of warranty.

## B. The Bottler

Appellant contends that the bottler also breached the implied warranties of merchantability found in Code (1957), Art. 95B, § 2-314. The bottler concedes that an implied warranty of merchantability exists with respect to appellant, the ultimate consumer, but asserts that appellant failed to prove that the warranty was broken because he failed to prove that a defect existed in the bottles at the time of their delivery to the retailer. We agree with the bottler.

Prior to 1969, Code (1957), Art. 95B, § 2-314 (1) provided in pertinent part that, "unless excluded or modified, a warranty that the goods shall be merchantable is implied in the contract for their sale if the seller is a merchant with respect to goods of that kind." No definition of "seller" was included in that particular section of the Act. Moreover, prior to 1969, Code (1957), Art. 95B, § 2-318 provided, insofar as here relevant, that "a seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." Official Comment 3 to this section stated that the section "expressly includes as beneficiaries within its provisions the family, household, and guests of the purchaser. Beyond this, the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain." Code (1957), Art. 95B, § 2-318, Official Comment 3 (1964 Repl. Vol.).

Effective 1 July 1969, § 2-314 was amended so as to include within the meaning of the term "seller" the

"manufacturer, distributor, dealer, wholesaler or other middleman and/or the retailer." The section was also amended to provide, in pertinent part, that "any previous requirement of privity is abolished as between the buyer and any of the aforementioned parties in any action brought by the buyer." [8] In addition, § 2-318 was amended to extend a "seller's" express or implied warranty not only to any natural person who is in the family or household of his buyer or a guest in his home, but also to "any other ultimate consumer or user of the goods or person affected thereby if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty." [9]

These amendments establish that protection under the implied warranty of merchantability provided in § 2-314 extends not only to the person buying for resale to the ultimate consumer (that is, the retailer) but also to the ultimate consumer. *See Blankenship v. Morrison Mach. Co.,* 255 Md. 241, 247, 257 A. 2d 430, 433 (1969).

While privity between the bottler and the ultimate consumer is not required, a "sale" or "contract for sale" is required in order to make the warranty implied by § 2-314 applicable. *See* note 3 above. Thus, there must be a sale or contract for sale from the bottler to some individual in the distributive chain in order for the implied warranties to arise in favor of the ultimate consumer. Here there was evidence that prior to Mr. Seigel's injuries, the bottler sold the bottles of Coca Cola selected by Mr. Seigel to the retailer, Giant Food, Inc. This evidence was sufficient to show that there was a warranty in existence which extended from the bottler to Mr. Seigel, the ultimate consumer.

However, as stated above, in order to recover on an implied warranty the plaintiff must show that the article sold did not conform to the representations of the warranty at the time it left the bottler's control. Here, the evidence shows that the bottles left the bottler's control when they

---

8. 1969 Laws of Maryland, Ch. 249.
9. *Id.*

were delivered to the aisle of the retailer's store. There is not an iota of affirmative evidence in this record to show that at that particular moment of time the bottles were not suitable for their intended use or were inadequately contained. Having failed to meet his required proof, appellant was not entitled to have the jury pass on the question of whether the bottler breached his warranty to the ultimate consumer. Accordingly, we will affirm the judgment in favor of the bottler, Washington Coca Cola Bottling Company, Inc., as to breach of warranty.

> *Judgment in favor of Washington Coca Cola Bottling Company, Inc., affirmed.*
>
> *Judgment in favor of Giant Food, Inc., reversed and case remanded for a new trial.*
>
> *Costs on appeal to be equally divided between appellant and Giant Food, Inc.*