635 F.2d 1102
 30 UCC Rep.Serv. 103
 COASTAL MODULAR CORPORATION, a corporation organized under
the laws of the State of Maryland, Appellee,
v.
LAMINATORS, INC., a corporation organized under the laws of
the Commonwealth of Pennsylvania, Appellant,
v.
PENNSYLVANIA MANUFACTURERS ASSOCIATION INSURANCE COMPANY, a
corporation organized under the laws of the
Commonwealth of Pennsylvania,
Third-Party Defendant,
and
Albi Manufacturing Corporation and Harad Paint Co., Inc., Appellees,
and
Alumax Mill Products, Inc., Third-Party Defendant.
 No. 79-1627.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 6, 1980.
Decided Oct. 23, 1980.
 
 Jack L. Hardwick, Baltimore, Md. (Hardwick, Tripoda & Harris, Baltimore, Md., Georganne Daher Terrill, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., on brief), for appellant.
 Neil J. Dilloff, Baltimore, Md. (Donald E. Sharpe, Piper & Marbury, Baltimore, Md., on brief), Charles M. Kerr, Baltimore, Md. (John H. Lewin, Jr., Venable, Baetjer & Howard, Baltimore, Md., on brief) and Alva P. Weaver, III, Baltimore, Md. (Frederick J. Green, Jr., Lord, Whip, Coughlan & Green, P. A., Baltimore, Md., on brief), for appellees.
 Before WINTER, WIDENER and SPROUSE, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 Laminators, Inc. (Laminators) appeals from the judgment of the district court in favor of Coastal Modular Corporation (Coastal) on its breach of warranty action and against Laminators on its third-party warranty action against Albi Manufacturing Corporation and Harad Paint Company, Inc. (Albi and Harad).
 
 
 2
 Coastal was notified in July 1978 by the United States Navy that panels in air traffic control towers assembled by Coastal for the Navy were defective and that they must be removed and replaced by Coastal. Coastal notified the manufacturer of the panels, Laminators, but the latter refused to replace them. Coastal brought this action against Laminators seeking anticipated damages for investigating the cause of the defects, and anticipated damages both for removing Navy-installed electrical elements from within the panels and replacing the panels. Laminators denied liability and filed a third-party action against Albi and Harad.
 
 
 3
 Coastal and the Navy had entered into a contract in mid-1975 for Coastal to produce thirty-one modules for the construction of air traffic control towers. The towers were for naval installations in Corpus Christi, Texas, and Charleston, South Carolina. At Coastal's initiation, the Navy allowed the modules to be constructed with panels consisting of aluminum bonded to plywood instead of corrugated steel, but required that all exposed wood surfaces be flame retardant. In response to Coastal's solicitation for a bid, Laminators submitted quotations and subsequently provided the panels required by the Navy/Coastal contract. At Coastal's request, Laminators' standard "Omega-Ply" panel was modified to consist of untreated wood bonded to aluminum with the backside of the wood coated with a fire-retardant paint manufactured by Albi and distributed by Harad.
 
 
 4
 Laminators supplied Coastal with an elaborate brochure describing its product. It warranted that the panels would maintain their original characteristics during the life of the original installation. Laminators agreed to refinish or repair panels not complying with the warranty. Alternatively, and at its election, Laminators agreed to pay for the cost of a replacement for each defective panel. The warranty contained no specific exclusion of consequential damages nor was there any disclaimer of implied warranties. The panels were warranted both for interior and exterior use.
 
 
 5
 Coastal paid Laminators $50,082.72 for the panels. Although the initial cost of installing the panels on the thirty-one involved modules is not reflected in the record, the cost of removing the defective panels and installing replacements was variously estimated as ranging from $335,000 to $400,000.
 
 
 6
 After manufacturing the panels, Laminators painted the edges and backs with fire-retardant paint, and stored them in an interior area. After they were shipped to Coastal, some of the twenty-seven modules designated for Charleston were briefly stored in the open and, although covered, were exposed to rain. The panels in the four modules delivered to Corpus Christi were neither stored in the open nor exposed to rain.
 
 
 7
 Coastal fabricated the tower modules by cutting down the Laminators panels to size and gluing them to blocks of insulation, aluminum face out. The panels were also glued to the interior side of the insulation blocks and fastened to the module frames, so that both the interior and exterior exposed sides of the frames were aluminum. Coastal delivered the first four modules to the Corpus Christi installation on February 13, 1976, with the remaining twenty-seven modules then assembled and shipped to the Charleston Naval installation. The Navy accepted all thirty-one modules, paid Coastal in full, and title to all modules passed to the Navy by the end of the summer of 1976. The Navy then installed electronic equipment in certain modules.
 
 
 8
 Corrosion appeared both on the inside and the outside walls of the panels, at both Corpus Christi and Charleston, after acceptance by the Navy. The Navy informally advised Coastal of the corrosion problem in October 1976, characterizing the defects as "latent." In September 1977, approximately a year after the defects were first discovered by the Navy, the Navy advised Coastal that the deterioration was continuing and had reached catastrophic proportions. The tabulations of panel damage accompanying the Navy's September 1977 letter disclosed that all but three of the modules contained defective panels. It also indicated that the number of corroded panels had drastically increased between October 18, 1976, and September 6, 1977. The Navy formally demanded that Coastal correct the latent defects pursuant to the contract between the Navy and Coastal. In July 1978, the Navy finally notified Coastal that if Coastal did not advise the Navy that it would replace the "defective material" the Navy would institute action to reprocure the material and would charge the cost of any procurement to Coastal.
 
 
 9
 Coastal advised Laminators of the defect immediately after it had received the first notification from the Navy; samples of corroded panels were sent to Laminators. Laminators' president inspected the panels in Charleston. Coastal and Laminators retained experts to investigate the cause of the corrosion, while the Navy had the panels analyzed at its laboratory at Charleston.
 
 
 10
 At the time of trial neither the Navy, Coastal, or Laminators had repaired or replaced the defective panels. The Navy remained in continuous communication with Coastal, but at no time contacted Laminators. Navy officials insisted both prior to trial and during their testimony that they looked only to Coastal for correction of the defective construction and had no intention of being involved with Laminators.
 
 
 11
 Coastal demanded that Laminators repair or replace the panels in accordance with the Navy-imposed deadlines, but Laminators refused. Coastal then filed the instant action. Coastal's complaint alleged breach of express and implied warranty, negligence and strict liability in tort, and breach of contract. The trial court found, however, that the action was "essentially an action for breach of contract," and it was tried on warranty principles.
 
 
 12
 Laminators contends on appeal that the district court erred in granting judgment to Albi and Harad in its third-party action. It also contends that the court erred in holding Coastal was entitled to maintain this action since its liability to the Navy was neither fixed in amount nor certain, in finding that Laminators had breached its limited warranty, in awarding Coastal consequential damages, in fixing the amount of the damages as $375,000.00, and in allowing the action to proceed without the joinder of the Navy under Fed.R.Civ.P. 19. Agreeing in most part with the district court's reasoning, and agreeing in the result, we affirm.
 
 I. THE THIRD-PARTY CLAIMS
 
 13
 Albi narrowly agreed, by the warranty contained in its brochure, that the paint would perform to the specifications set out in the brochure, but specifically disclaimed both any warranty of merchantability or fitness for a particular purpose and any liability for consequential damages.[1] Quite apart from the provisions in Albi's warranty, the court found that Albi's paint was not a proximate cause of the panels' corrosion. There is abundant evidence in the record to sustain that factual finding and little, if any, to negate it. Since the paint was not a proximate cause of the damage, Albi and Harad could not have been liable for breach of warranty. Mattos, Inc. v. Hash, 279 Md. 371, 368 A.2d 993 (1977); Sheeskin v. Giant Food, Inc., 20 Md.App. 611, 621, 318 A.2d 874 (1974), aff'd sub nom. Giant Food, Inc. v. Washington Coca-Cola Bottling Co., 273 Md. 592, 332 A.2d 1 (1975).
 
 
 14
 II. COASTAL'S RECOVERY AGAINST LAMINATORS FOR POTENTIAL
 
 LIABILITY TO THE NAVY
 
 15
 The trial court found that, since Coastal's potential liability to the Navy for the defective panels was both reasonably foreseeable and subject to calculation, it was properly the basis for the instant action. We agree. The Navy had notified Coastal that if Coastal did not acknowledge its liability and intention to replace the defective panels, the Navy would immediately contract for this construction work and charge the cost to Coastal. Since this demand was within the Navy's contractual rights, Coastal assumed liability and agreed to effect the repairs.
 
 
 16
 There can be no serious question but that Coastal is liable to the Navy to repair the defective panels. United States v. Franklin Steel Products, Inc., 482 F.2d 400 (9th Cir. 1973), cert. denied, 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974); United States v. Aerodex, Inc., 469 F.2d 1003 (5th Cir. 1972). The Navy's claim, whether resolved by court action or by settlement, was reasonably foreseeable. The trial court correctly found on the evidence that the damages Coastal will sustain in replacing the defective panels are subject to calculation with reasonable certainty. Under such circumstances it was not necessary that Coastal wait until the Navy completed the repairs to bring its action. Superwood Corp. v. Larson-Stang, Inc., 311 F.2d 735, 738-40 (8th Cir. 1963); Boyce v. Fowler, 87 F.Supp. 796 (D.Mass.1949).
 
 III. LAMINATORS' BREACH OF WARRANTY
 
 17
 Laminators argues that it did not breach its warranty but that the corrosion damage was caused by Coastal. It contends Coastal stored some panels in the open, exposed to rain and snow, causing the corrosive conditions.
 
 
 18
 The court found that the panels had not been saturated with rain or snow water after their delivery to Coastal, but that moisture trapped in the wood during the manufacturing process was a factor. It found further that Laminators had not used proper drying techniques. Two experts identified chloride ions as the corrosive agent present in the panels. Moisture trapped inside the plywood during the manufacturing procedures, they assert, combined with the chloride ions and caused the deterioration. One expert disagreed, hypothesizing that rain in combination with phosphorus present in the wood caused the corrosion. The court resolved this conflict in the evidence in favor of Coastal's position. Supporting the court's conclusions are the undisputed facts that panels at both Charleston and Corpus Christi showed signs of corrosion but only the Charleston panels were exposed to rain. Moreover, the panels did not show uniform signs of damage which rain would have caused, but, rather, the corrosion was limited to the center of the panels, indicating damage by internally-trapped water.
 
 
 19
 Whether Laminators' breach of warranty was the proximate cause of the corrosion was primarily a question of fact. We, of course, do not interfere with a trial judge's findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a); Friend v. Leidinger, 588 F.2d 61 (4th Cir. 1978). The trial judge's findings in this instance are clearly supported by the evidence.
 
 IV. PROPRIETY OF CONSEQUENTIAL DAMAGES
 
 20
 The trial court held that Coastal was entitled to consequential damages, including the cost of removing and replacing the panels. Laminators contends that the panels' warranty limits damage to $60,000.00, the cost of obtaining new panels-that consequential damages were improperly allowed. The warranty provides, in part:
 
 
 21
 Should any panel fail to comply with this guarantee, Laminators Incorporated will furnish a replacement panel or, at its election, refinish or repair same in place or make an allowance for the cost of a replacement panel.
 
 
 22
 The brochure contains no disclaimer of merchantability or fitness for use nor any language excluding consequential damages. Maryland law normally allows consequential damages for breach of warranty. Md.Com.Law Code Ann. § 2-714. Laminators argues, however, that its limited warranty provided Coastal only the specified alternate remedies listed in its brochure and that this is permitted by state law. Md.Com.Law Code Ann. § 2-719(1)(a). Coastal argues initially that "replacing or repairing" was intended to be a cumulative remedy-i. e., in addition to remedies provided by the Maryland Commercial Law Code. It cites the language of section 2-719(1)(b) to support this contention:
 
 
 23
 Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
 
 
 24
 Md.Com.Law Code Ann. § 2-719(1)(b). The Official Comment to § 2-719(1)(b) states:
 
 
 25
 Subsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed.
 
 
 26
 It is not necessary, however, to determine in this case whether the "replace or repair" provisions in Laminators' brochure were meant to provide exclusive remedies or whether the remedies' purposes are merely cumulative. Even if the remedies were meant to be exclusive, they failed their purpose and the usual remedies allowed by the Maryland Commercial Law Code, including consequential damages, are available.
 
 
 27
 It is, of course, true that section 719(1)(a) allows the buyer and seller, by warranty agreement, to alter the remedies that are made available by normal operations of the Maryland Commercial Law Code provisions. Section 719(2), however, provides:
 
 
 28
 Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in Titles 1 through 10 of this article.
 
 
 29
 Md.Com.Law Code § 2-719(2).
 
 
 30
 The trial court based its decision allowing consequential damages on this subsection. It found the remedies outlined in Laminators' brochure failed their essential purpose because Laminators failed, upon notice, to provide replacement panels. We agree that there was a failure of remedy. The failure, however, was due to inherent defects which could not have been corrected by replacing the panels after notice. The Navy discovered the defective panels only after they were completely in place in the control towers. Laminators was subsequently notified by Coastal to replace or repair the panels. Laminators' refusal to replace or repair did not contribute to the consequential cost in removing and replacing the panels, for the original excessive wood moisture caused the damage. Even had Laminators replaced the panels when notified, the same consequential labor costs in removing the old panels and installing the new ones would have been incurred.
 
 
 31
 A pragmatic approach in applying section 2-719(2) to a specific warranty involves an initial determination of the essential purpose intended by the seller and buyer in proposing and accepting the limited warranty.[2] There is no evidence in the record indicating the parties' actual intent in agreeing to the limited warranty language in the brochure, nor is there evidence concerning the usual commercial practice in the involved industry. The essential purpose of the limited warranty can only be gleaned from the transaction.
 
 
 32
 Coastal and Laminators each intended to receive something from their bargain. The limited warranty allowed Laminators to limit prospective damages. Coastal expected that defective panels would be replaced by virtue of the contract's terms, thus avoiding the inconveniences of delay during construction. See V-M Corp. v. Bernard Distributing Co., 447 F.2d 864, 868-69 (7th Cir. 1971); Beal v. General Motors Corp., 354 F.Supp. 423, 426 (D.Del.1973); Jones & McKnight Corp. v. Birdsboro Corp., 320 F.Supp. 39 (N.D.Ill.1970) Laminators' supplying new panels after latently defective panels were installed would only return Coastal a portion of its expense. In such case it would be relieved of the cost of the panels-in this case $60,000.00. Coastal, under this interpretation, would be obliged to assume the extra expenses of $315,000.00-the cost of removing the defective panels and installing the new ones. It is difficult to believe that a buyer in an equal bargaining position would accede to accepting such liability for a defect caused by the seller. In the absence of clear intention, we can not interpret an agreement as creating such a partial remedy.
 
 
 33
 Coastal and Laminators could have specifically agreed to limit consequential damages, but they did not. Section 2-719(3) provides that "consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." Md.Com.Law Code § 2-719(3). Section 2-719(3) is not limited by the other subsections of section 2-719. Had Laminators' warranty specifically limited consequential damages, Coastal could have only received its costs of the material even though that represented partial failure of the essential purpose of the warranty. It seems unlikely that a buyer would agree to such a limitation in the circumstances of this case, but a conscious acceptance of such an agreement would bind him even in the face of a partial failure of the essential purpose of the remedy unless the limitations were unconscionable. The fact that Laminators and Coastal did not agree to limit consequential damages at least supports the conclusion that the essential purpose of the remedy in the agreed warranty was to provide replacement panels in time for inclusion in the original construction.
 
 
 34
 Since we conclude that one essential purpose of the bargained remedy was to provide replacement panels in time for inclusion in the assembled modules, the essential purpose failed. Coastal is, therefore, entitled to consequential damages, under the provisions of section 2-719(2).
 
 V. DENIAL OF THE RULE 19(a) MOTION
 
 35
 The trial court denied Laminators' motion to require that the Navy be joined as a party under Rule 19(a) of the Federal Rules of Civil Procedure. The portion of Rule 19(a) upon which Laminators relies provides:
 
 
 36
 A person ... shall be joined as a party in the action if ... (2) he claims an interest ... and is so situated that the disposition of the action in his absence may ... (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.
 
 
 37
 Fed.R.Civ.P. 19(a). Laminators contends that it may be subject to a substantial risk of incurring multiple obligations because the Navy is not a party to the action. The trial court justifiably found, however, that Laminators could only theorize the possibility that the Navy would institute suit against it. Nothing before the court suggested a substantial likelihood of such a suit.[3] The inquiry contemplated by Rule 19 is a practical one. 7 C. Wright & A. Miller, Federal Practice and Procedure § 1604 (1972). It is addressed to the sound discretion of the trial court. General Tire & Rubber Co. v. Watkins, 326 F.2d 926 (4th Cir.), cert. denied, 377 U.S. 909, 84 S.Ct. 1629, 12 L.Ed.2d 498 (1964). We find no abuse of discretion under the circumstances.
 
 VI. AMOUNT OF DAMAGES
 
 38
 Laminators' last contention is that the court erred in fixing the amount of the damages as $375,000.00. The trial court denied Coastal's claim for costs incurred in investigating the cause of the corrosion and other pretrial expenses based on its finding that they were basically litigation expenses. The district court also denied Coastal's request for damages contemplated by the Navy's removal of the electronic elements from the panels because it felt that the Navy had been negligent in some respects not pertinent to this appeal. The court allowed only consequential and incidental damages directly chargeable to Coastal.
 
 
 39
 Several qualified witnesses carefully calculated that panel replacement costs would range from $335,000 to $400,000; Laminators introduced no evidence countering these assertions. Once again, since the court acted in its fact-finding role, and there was more than sufficient evidence to sustain its findings, the district court's ruling on the question of damages must be upheld.
 
 
 40
 The decision of the district court is affirmed.
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 "WARRANTY ... Albi warrants that its product will meet the specifications which it sets for them. Albi disclaims all other warranties ... whether expressed or implied. All disclaimers include but not limited to the warranties of MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE."
 
 
 [2]
 See Eddy, On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2-719(2), 65 Calif.L.Rev. 28, 30-40 (1977)
 
 
 [3]
 Evidence showed that it was clearly understood between the Navy and Coastal that the responsibility of litigating the matter would rest with Coastal alone. The trial court concluded that the Navy's interests were being effectively protected by Coastal