GIANT FOOD, INC. AND MARILYN SEIGEL
SHEESKIN, PERS. REP. OF NATHAN SEIGEL
v. WASHINGTON COCA-COLA BOT-
TLING COMPANY, INC.

[No. 93, September Term, 1974.]

*Decided February 4, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*William·N. Rogers*, with whom were *William D. Appler, Michael John Hoover* and *Carr, Bonner, O'Connell, Kaplan & Thompson* on the brief, for Giant Food, Inc., part of appellants. *Linda D. Schwartz*, with whom were *Jacob*

594

*Sheeskin* and *Sheeskin & Hillman* on the brief, for Marilyn Seigel Sheeskin, etc., other appellant.

*Albert D. Brault,* with whom were *Brault, Scott & Brault* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

In this case, we are presented with formidable questions of products liability law arising from an action for injuries caused by an exploding Coca Cola bottle. The damage suit, brought in the Circuit Court for Montgomery County against Giant Food, Inc. (the retailer) and the Washington Coca Cola Bottling Company, Inc. (the bottler), resulted in a directed verdict for the defendants. On appeal from that decision, we remanded the case for further proceedings without affirmance or reversal in an unreported per curiam opinion.

On remand, the case was reopened in the circuit court to allow the inclusion of an additional stipulation. Renewed motions for directed verdicts were then granted on the basis of the original evidence and the added stipulation. On appeal from that decision, the Court of Special Appeals, in *Sheeskin v. Giant Food, Inc.,* 20 Md. App. 611, 318 A. 2d 874 (1974), affirmed the judgment in favor of the bottler, but reversed the judgment in favor of the retailer and remanded that case for a new trial.

The incident from which this appeal stems occurred on Friday October 23, 1970, when the late Nathan Seigel (the customer) was carrying a six-pack carton of Coca Cola from a display bin to a shopping cart in one of the retailer's stores.[1] While he was so engaged, one or more of the bottles exploded causing him to lose his footing, fall to the floor and sustain personal injuries. His case against both defendants was posited on the docrtine of *res ipsa loquitur* and breach of implied warranty. The Court of Special Appeals held that he

---

1. Upon the death of Mr. Seigel while the case was pending in the Court of Special Appeals, Marilyn Seigel Sheeskin, personal representative of his estate, was substituted as a party.

could recover from the retailer under both theories, but from the bottler under neither one. The customer and the retailer sought review by petitions for Writs of Certiorari which we granted.

The relevant testimony was undisputed. The customer testified that the cartons from which he selected his six-pack were displayed in typical supermarket fashion. They were stacked four cartons deep and five or six cartons high with shelf-like separators formed by retractable plastic sheets. The carton he selected was not defective in any way; nor was there any liquid in this area of the store. It was unnecessary for him to reach very high to lift the carton. As he did so, he placed four fingers of his right hand through both handles of the cardboard carton which was located near the top of the stack. While the carton was lifted and removed from the bin, it neither touched nor was touched by anything other than his hand. Nor did anything fall as this occurred.

After the customer had taken three or four steps toward a shopping cart, there was an explosion which knocked the carton completely from his hand. As he attempted to move, he lost his traction and fell to the floor, which immediately had become slippery from the Coca Cola. According to the store manager, the explosion was of sufficient force to shatter three or four bottles. No effort could be made to examine them, however, since the broken glass was swept up and removed by store employees.

The evidence shows that the bottles of Coca Cola delivered to the retailer during October 1970 were stored for a maximum of five days in an area maintained at a constant temperature of 72°. Once delivered to the appropriate aisle in the store by an employee of the bottler, the cartons of Coca Cola were removed from wooden cases and stacked in the bin by the retailer's employees. During the two to five days in which they remained on the shelf, they might have been periodically rearranged and restacked by store employees. There was also testimony that cartons which occasionally might have been abandoned by customers at various locations throughout the store would have been returned to the shelves by employees.

The retailer's store, of course, is of the self-service variety, which means that the only manner in which a customer can purchase an item is to select it himself. There are occasions when a customer may choose an item, then change his mind and return it to its place. The testimony here, however, shows that Coca Cola customers ordinarily do not change their minds after they have removed a carton from the shelf, but when they do, they "never" or "hardly ever" return the carton to the shelf from which it was removed. Cartons abandoned about the store in this manner are normally found in various places such as on the freezers, the floors or other counters.

The bottler's plant manager testified that it purchases its bottles from several different manufacturers. All of the bottles which it buys are manufactured in accordance with standards fixed by the National Soft Drink Association. At its bottling plant, all bottles are visually and electronically inspected in order to discover defects. Defective bottles which escape detection would, nevertheless, break when subjected to pressurization. Between 1967 and 1970, the bottler produced a total of 288,000,000 bottles, but received only 11 complaints of exploding bottles. The uncontradicted evidence revealed that there are three primary causes of the explosion of a Coca Cola bottle: a manufacturing defect, a thermal shock or an impact break resulting from mishandling.

The bottles are moved by machine throughout the entire bottling process, from their unloading when delivered to the plant by the manufacturer, through the washing, sterilization, inspection, pressurization, filling, capping and ultimate packaging in cardboard cartons, each containing six bottles of Coca Cola, and then in wooden cases, each containing four six-packs. Once filled, the bottles are stored in a ventilated but non-refrigerated area of the plant for a maximum period of two weeks prior to their delivery.

The bottles are delivered in non-refrigerated trucks, especially designed to avoid the possibility of impact damage during transit. The Coca Cola is handled non-mechanically only when the bottler's employee removes the wooden cases

from the bottler's truck, stacks them four or five high on a hand truck, carries them from the rear of the retailer's store to the aisle in which they are to be displayed, and stamps the price upon the cardboard cartons. The bottles in this case were delivered on either the 19th or 21st of October 1970.

In this Court, the retailer argues for reversal of the Court of Special Appeals decision on the grounds that the customer is entitled to prevail against it neither in negligence nor in warranty. The customer, in addition to urging affirmance of that part of the decision, argues that the Court of Special Appeals erred in rejecting the claims based on both negligence and warranty against the bottler. The latter, content with the decision, urges that we affirm. First, we consider the claims of negligence, which, as we have indicated, are bottomed on the doctrine of *res ipsa loquitur*.

### 1(a)

In *Leikach v. Royal Crown*, 261 Md. 541, 547-48, 276 A. 2d 81 (1971), the most recent exploding-bottle case decided by this Court, we repeated the three elements necessary for the application of *res ipsa loquitur* in Maryland which we had enunciated in *Munzert v. American Stores*, 232 Md. 97, 104, 192 A. 2d 59 (1963):

"1. A casualty of a sort which usually does not occur in the absence of negligence.

"2. Caused by an instrumentality within the defendant's exclusive control.

"3. Under circumstances indicating that the casualty did not result from the act or omission of the plaintiff."

The parties here all agree that the customer has established the first and third; the contention advanced by both the retailer and the bottler is that he has not established exclusive control.

In *Leikach* we adopted the view that the burden upon one who relies on *res ipsa loquitur* in an exploding bottle case does not require the exclusion of every possible cause of

injury other than that of the bottler's negligence, but does include proof that there is a greater likelihood that injury was caused by the defendant's negligence than by some other cause. Other state courts have applied a similar test. In *Evangelio v. Metropolitan Bottling Co.*, 339 Mass. 177, 158 N.E.2d 342, 345 (1959), which we cited with approval in *Leikach*, the court said:

> "... [Plaintiff] is not required to exclude every possible cause for her injuries other than that of negligence; she is only required to show a greater likelihood that her injury was caused by the defendant's negligence than by some other cause...."

Also in accord are *Holkestad v. Coca-Cola Bottling Co. of Minnesota, Inc.*, 288 Minn. 249, 180 N.W.2d 860, 865 (1970) and *Zarling v. La Salle Coca Cola Bottling Co.*, 2 Wis. 2d 596, 87 N.W.2d 263, 267 (1958).

Applying this rule, the Court of Special Appeals held:

> "On the basis of the record before us we are convinced that the evidence was sufficient to show a greater likelihood that Mr. Seigel's injury was caused by the retailer's negligence rather than by some other cause. Having met his burden of proof, appellant was entitled to have *res ipsa loquitur* applied and to have the jury pass on the question of Giant's negligence...." 20 Md. App. at 620.

In attacking this decision, the retailer argues that the doctrine of *res ipsa loquitur* is not applicable in suits charging a retailer with negligence, and, in any event, that the customer did not present sufficient evidence to invoke the doctrine here because he nevertheless failed to meet the *Leikach* test.

It may well be that in the exploding bottle category, most of the reported decisions in which the customer has successfully invoked *res ipsa loquitur* have been claims against bottlers rather than retailers. But nothing in our prior cases, nor in those decided elsewhere, supports the

notion that the doctrine is per se inapplicable to retailers. The likely explanation where such suits have been unsuccessful, as was the case in *Joffre v. Canada Dry, Inc.*, 222 Md. 1, 158 A. 2d 631 (1960), has been the customer's inability to establish a *greater likelihood* that injury was caused by the retailer's negligence than by some other cause. In this case, the Court of Special Appeals held that the customer had met that test in his claim against the retailer, and we agree. Without repeating the facts which we have already recited, we conclude the testimony eliminates the possibility that the explosion was caused either by thermal shock or by a manufacturing defect. On the other hand, we agree with the Court of Special Appeals that:

> "... [the] evidence not only supports the inference that there was a substantial likelihood of impact damage resulting from mishandling by the retailer's employees during the period within which the bottles were in the retailer's control, but also the further inference that because the opportunities for mishandling by the retailer were considerably more extensive than those of the bottler, there was a greater likelihood that Mr. Seigel's injuries were caused by the negligence of the retailer than by any cause within the control of the bottler." 20 Md. App. at 619-20.

Similarly, the evidence also supports an inference that as between the customer and the retailer, the greater probability of negligence lies with the retailer. We agree, therefore, with the conclusion of the Court of Special Appeals that "the evidence was sufficient to show a greater likelihood that [the customer's] injury was caused by the retailer's negligence than by some other cause." 20 Md. App. at 620. Hence, the customer was entitled to have *res ipsa loquitur* applied and to have the jury pass on the issue of the retailer's negligence.

## 1(b)

We are also confronted with the argument that the

customer is entitled to invoke the doctrine of *res ipsa loquitur* against the bottler, as well as against the retailer. Thus, it is argued, "once the plaintiff established that he was not ·responsible for the occurrence, the burden would then rest upon the . . . retailer to show that after the bottle came into its possession that it was not subject to any mishandling or atmospheric or temperature changes." Then, the burden would devolve upon the bottler to establish the procedures employed in the bottling process. The ultimate responsibility for determining culpability would then rest with the jury, which would decide whether reasonable care had been exercised by one or both of the defendants.

Only two states, Kansas and Pennsylvania, have adopted a rule in exploding bottle cases which shifts the burden of proof to multiple defendants once a *prima facie* case of negligence, based on *res ipsa loquitur*, has been established. *Nichols v. Nold,* 174 Kan. 613, 258 P. 2d 317, 38 A.L.R.2d 887 (1953); *Loch v. Confair,* 372 Pa. 212, 93 A. 2d 451 (1953). In the latter, the Pennsylvania court applied the doctrine of "exclusive control" which, to our knowledge, has not been followed elsewhere. The essence of this concept is that the evidence of the cause of injury is not equally available to both sides, but is exclusively accessible to and within the possession of the defendants.

The rule followed in Kansas and Pennsylvania, which, in effect, permits the plaintiff to make out a *prima facie* case of *res ipsa loquitur* against two defendants by showing merely that he has been injured by the negligence of one or the other, has not gained favor with the courts or the commentators. As Dean Prosser put it, "The reasoning in these cases as to the meaning of 'exclusive control' is not very convincing; and they are quite evidently deliberate decisions of policy, seeking to compensate the plaintiff and to require the defendants to fight out the question of responsibility among themselves." Prosser, *The Fall of the Citadel,* 50 Minn. L. Rev. 791, 847 (1966).

In *Joffre v. Canada Dry, Inc., supra,* the customer also sued the retailer and the bottler. There, however, the evidence was too inadequate to invoke *res ipsa loquitur*

against either, since the testimony permitted "too many inferences of causes for the occurrences for which neither the bottler nor the [retailer] would be responsible . . . ." 222 Md. at 10. Although the question now presented here was not squarely before us for decision, we said:

"We are not unmindful that several courts recently have taken the view that the explosion in a store of a bottle of carbonated beverage, without more, requires both the bottler and the retailer to go forward and exonerate themselves from responsibility. These are *Loch v. Confair* (Pa.), 93 A. 2d 451, and *Nichols v. Nold* (Kan.) 258 P. 2d 317. See also *Ferrell v. Royal Crown Bottling Co. of Charleston* (W. Va.), 109 S.E.2d 489.

". . . We are not prepared to hold, as the three cases last cited in effect held, that the plaintiff's ignorance of, or inability to prove, facts giving rise to a reasonable inference of negligence, can compel the defendant to supply what is needed for recovery.

\* \* \*

"While we need not decide the question, since the plaintiff's proof was inadequate otherwise, we note, too, that the Pennsylvania and Kansas decisions seemingly invoke the doctrine of *res ipsa loquitur* against multiple defendants not claimed to have been guilty of joint negligence (indeed the proof permitting recovery against the bottler almost necessarily would show the retailer to have been blameless), although generally it has been held that *res ipsa* is not applicable against multiple defendants where it is not shown that their liability was joint or that they were in joint or exclusive control of the injury producing factor, or where the wrongdoer, among several possible, was not identified. . . ." 222 Md. at 10-11.

Here, as we have indicated, there is no evidence permitting an inference of a manufacturing defect. Nor does

the testimony permit an inference that thermal shock during the period of time in which the bottler controlled the bottles caused the explosion. Finally, as we said earlier in quoting from the decision of the Court of Special Appeals, the evidence does support the inference that "because the opportunities for mishandling by the retailer were considerably more extensive than those of the bottler, there was a greater likelihood that [the customer's] injuries were caused by the negligence of the retailer than by any cause within the control of the bottler." 20 Md. App. at 620. In such circumstances, we decline to extend the doctrine of *res ipsa loquitur* to a case against multiple defendants absent a showing that their liability was joint or that they were in joint or exclusive control of the injury producing factor; or that the wrongdoer, among several possible, has not been identified.

### 2(a)

In respect to the customer's reliance upon breach of implied warranty, two questions are presented, one by the claim against the retailer and the other in the case against the bottler. In considering this aspect of the case, the Court of Special Appeals held correctly that in an action brought for breach of implied warranty of merchantability under Maryland Code (1957, 1964 Repl. Vol.) Art. 95B, § 2-314, it is necessary to show not only the existence of the warranty, but that the warranty was broken and that the breach was the proximate cause of the loss sustained, *Sheeskin v. Giant Food, Inc., supra,* 20 Md. App. at 620-21; *see Erdman v. Johnson Brothers,* 260 Md. 190, 195, 271 A. 2d 744 (1970); Official Comment 13 to § 2-314.

The question raised by the retailer's appeal is whether, as against it, the customer has established the existence of the warranty. This stems from the retailer's contention that the customer has failed to prove that there was a sale or contract of sale between them, as provided by § 2-314, because at the moment of explosion, the customer had not yet paid for the Coca Cola.[2]

---

2. Section 2-314 (1) now provides in relevant part:

The Court of Special Appeals held that the customer met his burden of showing the existence of the warranty by establishing that at the time the bottles exploded, there was a contract for their sale existing between him and the retailer. This result is attacked by the retailer who contends that the time of contracting in a self-service store does not occur until the goods reach the check-out counter and payment is made; that rather than an executory bilateral contract, there arose a classical unilateral contract which is accepted only by performance.

Apart from § 2-314, itself, several other provisions of the U.C.C. combine to support the conclusion reached by the Court of Special Appeals. We begin with § 2-106 which defines several relevant terms:

> "(1) In this subtitle unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods. 'Contract for sale' includes both a present sale of goods and *a contract to sell goods at a future time.* A 'sale' consists in the passing of title from the seller to the buyer for a price (§ 2-401). A 'present sale' means a sale which is accomplished by the making of the contract.

> \* \* \*

> "(3) 'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On 'termination' all obligations which are still executory on both sides are discharged but *any right based on prior breach or performance survives.*" (emphasis added).

Although some of the cases in the past have emphasized the passage of title when dealing with this issue, we think it

---

"(1) Unless excluded or modified (§2-316), a warranty that the goods shall be merchantable is implied in a *contract for their sale* if the seller is a merchant with respect to goods of that kind. . . ." (emphasis added).

clear that the matter of title is no longer controlling under the U.C.C. As we said in *Wilke, Inc. v. Cummins Diesel,* 252 Md. 611, 615, 250 A. 2d 886 (1969), "[o]ne of the most startling differences between the U.C.C. and the Sales Act is the U.C.C.'s adoption of a flexible contractual approach instead of following the more rigid concept of title to which the Sales Act adhered." Section 2-401 provides that "[e]ach provision of this subtitle with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. . . ." The purpose of this language is unequivocally set forth in the Official Comment to § 2-401:

"1. This Subtitle deals with the issues between seller and buyer in terms of step by step performance or non-performance under the contract for sale and not in terms of whether or not 'title' to the goods has passed. . . ."

The point is reinforced by the Official Comment to § 2-106:

"1. Subsection (1): 'Contract for sale' is used as a general concept throughout this Subtitle, but the rights of the parties do not vary according to whether the transaction is a present sale or a contract to sell unless the Subtitle expressly so provides."

Thus, the U.C.C. has provided the impetus for this more flexible contractual approach. To demonstrate further, § 2-204 provides:

"(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

"(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined. . . ."

Section 1-201(3) defines "agreement" as "the bargain of the

parties in fact as found in their language or by implication *from other circumstances* including course of dealing or usage of trade or course of performance as provided in this article. . . ." (emphasis added).

With these provisions in mind, the Court of Special Appeals reached the following result, with which we agree:

"We think that there is sufficient evidence to show that the retailer's act of placing the bottles upon the shelf with the price stamped upon the six-pack in which they were contained manifested an intent to offer them for sale, the terms of the offer being that it would pass title to the goods when Mr. Seigel presented them at the check-out counter and paid the stated price in cash. We also think that the evidence is sufficient to show that Mr. Seigel's act of taking physical possession of the goods with the intent to purchase them manifested an intent to accept the offer and a promise to take them to the check-out counter and pay for them there.

"Code (1957), Art. 95B, § 2-206 provides in pertinent part:

'(1) Unless otherwise unambiguously indicated by the language or circumstances

(a) An offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances. . . .'

"The Official Comment 1 to this section states:

'Any reasonable manner of acceptance is intended to be regarded as available unless the offeror has made quite clear that it will not be acceptable.'

"In our view the manner by which acceptance was to be accomplished in the transaction herein involved was not indicated by either language or

circumstances. The seller did not make it clear that acceptance could not be accomplished by a promise rather than an act. . . ." *Sheeskin v. Giant Food, Inc., supra,* 20 Md. App. at 624-25.

Courts elsewhere also have held that in the context of a self-service supermarket, a contract for sale may arise before payment is actually made for the goods. *Sanchez-Lopez v. Fedco Food Corp.,* 211 N.Y.S.2d 953, 956-57 (N.Y. City Ct. 1961); *Gillispie v. Great Atlantic and Pacific Tea Company,* 14 N.C.App. 1, 187 S.E.2d 441 (1972); *see Lucchesi v. H. C. Bohack Co., Inc.,* 8 UCC Rept. Serv. 326 (N.Y. Sup. Ct., Queens County 1970). *Accord Day v. Grand Union Co.,* 280 App. Div. 253, 113 N.Y.Sup.2d 436, 439 (1952) (Brewster, J., concurring). Concededly, the *Gillispie* court did devote part of its discussion to the passage of title, but did so because the North Carolina statute creates an implied warranty "only upon a sale of goods." *Contra, Lasky v. Economy Grocery Stores,* 319 Mass. 224, 65 N.E.2d 305, 306, 163 A.L.R. 235 (1946); *Loch v. Confair, supra; Day v. Grand Union Co., supra.* The latter three cases were all decided prior to the adoption in their respective states of the U.C.C., with its liberalized concept of contract formation.

Nor, in concluding that a contract was established when the customer removed the goods from the shelf, and thus evidenced a promise to deliver them to the check-out counter and to pay for them there, was the Court of Special Appeals oblivious to the fact that customers are permitted to return goods to the shelf. Noting § 2-106(3), quoted earlier, Judge Davidson, for the court, said:

> ". . . Here the evidence that the retailer permits the customer to 'change his mind' indicates only an agreement between the parties to permit the consumer to end his contract with the retailer irrespective of a breach of the agreement by the retailer. It does not indicate that an agreement does not exist prior to the exercise of this option by the consumer." 20 Md. App. at 625.

The retailer complains that this result "introduces

unnecessary complexity into the law governing 'self-service' establishments." We do not agree. What this argument overlooks is that the customer who is welcomed into the retailer's store is faced with no choice. If he chooses to shop in that store, he must do so under the terms imposed by the retailer. He must select goods, place them in a cart provided by the retailer, and then tender payment at the check-out counters located near the exit. Thus, the only reasonable manner in which a customer of a self-service establishment can accept the store's offer is by taking the goods into his possession. The argument advanced by the retailer, pursued to its logical conclusion, would have the effect of restricting a "contract for sale" to "present sale" situations. This result would collide with § 2-106 (1), quoted earlier, which includes both a present sale of goods and a contract to sell goods at a future time within the definition of a "contract for sale."

Given the existence of an implied warranty of merchantability here there can be no doubt of its breach, and, therefore, a cause of action against the retailer. What the Court of Special Appeals said in this regard is apposite and we adopt it: "It is axiomatic that a buyer may recover for breach of warranty without proving negligence on the part of the seller. . . . In order to recover on a warranty, the plaintiff need show only that the article sold did not conform to the representation of the warranty at the time it left the control of the defendant. . . ." 20 Md. App. at 629-30.[3]

### 2(b)

Unlike the retailer, the bottler concedes, as, indeed, it must in light of § 2-318, that as between it and the customer, a warranty of merchantability did exist. The issue presented here is whether the bottler breached that warranty. The Court of Special Appeals held that the customer did not prove such a breach because he failed to establish that the article sold did not conform to the representations of the warranty at the time it left the bottler's control; in other words, there was no evidence tending to show that a defect

---

3. It is conceded by all parties here that the defect was the proximate cause of the customer's injuries.

existed in the bottles at the time of their delivery to the retailer.

That the plaintiff in a breach of warranty action must prove that the article sold did not at the time of sale conform to the representations of the warranty is not open to question, *Hacker v. Shofer*, 251 Md. 672, 248 A. 2d 351 (1968); *Great Atlantic, Etc., Co. v. Adams*, 213 Md. 521, 132 A. 2d 484 (1957). Maryland is not alone in this view. *Butterfield v. Pepsi-Cola Bottling Co. of Wichita*, 210 Kan. 123, 499 P. 2d 539, 542 (1972); *Lucchesi v. H. C. Bohack Co., Inc., supra*, 8 UCC Rept. Serv. at 329; *Cooper v. Mason*, 14 N.C.App. 472, 188 S.E.2d 653 (1972). In *Butterfield*, heavily relied upon here by the customer, the court quoted from a prior decision:

> " 'Only recently we had occasion to point out that irrespective of the theory of recovery — negligence or implied warranty — a prerequisite to recovery against a manufacturer for a defective product is that the plaintiff must show the product was defective at the time it left the manufacturer's control. . . .

> \* \* \*

> " '. . . Thus, it may be said as a general rule that there must be evidence from which it may reasonably be inferred that the defect existed at the time the product left the possession or control of the *party sought to be held liable.*' " 499 P. 2d at 542 (emphasis added).

The particular problem presented here, therefore, is whether the customer has presented sufficient evidence of a defect in the bottles at the time of delivery to the retailer to warrant submission of his case to the jury. Although he was referring to strict liability, what Dean Prosser said is instructive:

> "Strict liability [or warranty] eliminates both privity and negligence; but it still does not prove the plaintiff's case. He still has the burden of

establishing that the particular defendant has sold a product which he should not have sold, and that it has caused his injury. . . . The mere possibility that this may have occurred is not enough, and there must be evidence from which the jury may reasonably conclude that it is more probable than not. . . .

"The plaintiff must prove . . . that he was injured because the product was defective, or otherwise unsafe for his use. . . .

"Further, the plaintiff must prove that the defect was in the product when it was sold by the particular defendant. When on the evidence it is equally likely that it developed after the product left his hands, . . . no liability is established on the part of any previous seller.

\* \* \*

"The bare fact that an accident happens to a product . . . is usually not sufficient proof that it was in any way defective. . . . On the other hand, the addition of very little more in the way of other facts, . . . may be enough to support the inference. . . ." Prosser, *The Fall of the Citadel*, 50 Minn. L. Rev. 791, 840-44 (1966).

In short, then, to allow the jury to decide whether there was a breach of the warranty, there must be some evidence beyond mere speculation which would enable the jury to rationally decide it is more probable than not that the defect existed at the time of sale, which in this case, would have been when the bottles were delivered to the retailer. Here, there was no such evidence. As with the proof of negligence in the context of *res ipsa loquitur*, the evidence presented here fails to establish a defect in the bottle when it was delivered to the retailer, but indicates a greater likelihood that at the moment of such delivery, there was no defect.

Having failed to present sufficient evidence to meet the burden of proof imposed in this case, the customer is not

entitled to have the jury pass on the question of whether the bottler breached its warranty to the ultimate consumer.

> *Judgments affirmed; costs to be equally divided between both appellants.*