EATON CORPORATION ET AL. *v.* RONALD J. WRIGHT ET AL.

[No. 22, September Term, 1977.]

*Decided July 19, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Jeffrey R. Schmieler*, with whom were *Carlton L. Saunders* and *Saunders & Schmieler* on the brief, for appellant Eaton Corporation; *Edward C. Donahue* and *Donahue & Ehrmantraut* on the brief, for appellant M. A. Gerett, Inc.; *John A. Buchanan* and *Sasscer, Clagett, Channing & Bucher* on the brief, for appellant Coleman Company, Inc.

*Brian J. Nash* and *Burt M. Kahn*, with whom were *Walter E. Laake, Jr.*, and *Kaplan, Smith, Joseph, Greenwald & Laake* on the brief, for appellees.

ELDRIDGE, J., delivered the opinion of the Court.

In June 1972, Ronald Wright and Anthony Fusco were injured while using a propane torch and fuel canister. The valve of the propane fuel canister failed to close when the canister was detached from the torch head appliance, allowing the fuel to escape and resulting in an explosion. Wright and Fusco instituted an action for injuries sustained in the explosion in the Circuit Court for Prince George's County against the distributor of the canister, the Coleman Company, Inc. (Coleman), whose label appeared on the canister. The declaration alleged breach of warranty, negligence, and strict liability in tort. Coleman filed a third-party declaration against M. A. Gerett, Inc. (Gerett), the manufacturer of the canister, claiming breach of warranty and seeking indemnification under its contract with Gerett. Gerett, in turn, filed a fourth-party declaration against the Eaton Corporation (Eaton), the manufacturer of the valve alleged to be defective, claiming breach of warranty and seeking indemnification from Eaton in the event that Gerett should be found liable to Coleman. Wright and Fusco did not amend their declarations to include either Gerett or Eaton as defendants.

Prior to trial, all parties stipulated to the damages to which Wright and Fusco would be entitled in the event that Coleman were found liable to the plaintiffs. Also prior to trial, the plaintiffs dismissed the negligence count against Coleman. Thus, as to Coleman, the action proceeded to trial

on the theories of breach of warranty and strict liability. At the conclusion of the trial, the court, sitting without a jury, entered a judgment in favor of Wright and Fusco against Coleman. Based upon the court's reliance, in its oral opinion, upon our recent decision in *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A. 2d 955 (1976), Coleman's liability was apparently premised upon the theory of strict liability in tort. The court also entered a judgment in favor of Coleman on its third-party declaration against Gerett based on the indemnification clause in the contract of sale between them. Additionally, the court entered a judgment in favor of Gerett on its fourth-party declaration against Eaton, finding that there was a defect in the valve sold by Eaton to Gerett. All defendants subsequently filed appeals from the respective judgments to the Court of Special Appeals, and we issued a writ of certiorari prior to any proceedings in the Court of Special Appeals.

The accident which gave rise to this litigation occurred when the plaintiffs were attempting to fix a leaking water pipe at the home of Wright's tenant. Wright was experienced in doing this type of repair work and had often used a propane torch. He owned a Sears "Craftsman" propane tool kit which included a torch head appliance. He had this kit several years and had used it with various propane fuel canisters in the past without incident. On the night of the accident, the fuel canister which Wright had brought to use with the torch head ran out of fuel. Wright then called Mr. Fusco, a friend who also was experienced with propane tools, and requested that Fusco bring a fuel canister. However, that canister also ran out of fuel. No difficulty was encountered with these canisters either when they were attached or detached from the torch head.

In order to complete the repairs that evening, Wright went to a local drugstore to purchase a new propane fuel canister.[1] He selected a canister bearing a Coleman label which stated that the canister was designed to fit "all

---

1. The retailer was not sued by either of the plaintiffs nor made a party to this action by any of the defendants. There have been no allegations that any defect in the canister was caused in any way by the retailer.

standard propane torches." Wright immediately returned to the tenant's home where, according to instructions on the propane canister, he attached the torch head to the canister by screwing the head into the cylinder "hand tight." He encountered no difficulty in attaching the torch head, nor did he notice anything unusual while using the torch head when attached to the Coleman canister. When the repairs were completed, Fusco, according to instructions on the canister that it be detached from any appliance when not in use, began to unscrew the torch head from the canister. While in the process of unscrewing the torch head, gas under high pressure was suddenly released from the canister. The pressure was so great that the torch head "flew out" of Fusco's hand. The canister itself fell to the floor, continuing to release gas. Both Wright and Fusco tried to grab the canister but were unable to do so because it turned ice cold. The gas was apparently ignited by the pilot light of a hot water heater or furnace in the area, causing an explosion.

The canister involved in this case was manufactured by M. A. Gerett, Inc., according to specifications supplied by Coleman. It was the practice for Gerett to attach a Coleman label to the canisters and ship them directly to Coleman customers as instructed. A sub-component used in the manufacture of the canister is a valve core manufactured by the Dill Division of Eaton. The valve core itself is composed of several components. It in many ways resembles the air valve commonly found on automobile tires. It is oblong in shape and has a "barrel" designed to extend inside the canister. At the bottom end of the barrel is a "cup" which creates a seal preventing the contents of the canister from escaping. Extending from the cup through the barrel, and through a "bridge" which is the top portion of the valve core, is a pin which is held in place by a spring. When downward pressure is exerted on the pin, it breaks the seal formed by the cup and allows the pressurized gas to escape through the valve. The valve core itself is screwed into the canister at the "swivel" which is a threaded area at the top of the barrel. This forms a seal between the valve core and the canister. Directly above the swivel is the metal "bridge" with the hole

in it through which the pin moves. Appliances designed to be used with this canister, such as the Sears torch head which Wright owned, have a probe which, when the appliance is screwed on to the canister, pushes the valve pin down. This breaks the seal between the cup and the valve core barrel and allows the pressurized gas to escape. When the appliance is unscrewed, the pin is supposed to move freely by spring force back up, re-establishing the seal between the cup and the barrel.

The canister involved in this accident was examined and tested by Keith Austin, who appeared as an expert witness on behalf of the plaintiffs. Mr. Austin, an engineer, had been employed for eleven years by Value Engineering Laboratories, a firm engaged in the evaluation and testing of various products including investigations of product failures. Mr. Austin testified that he cut the canister in half in order to view the operation of the valve. He screwed on a torch head several times, and on some occasions the valve would stick in the open position after the torch head was removed. Upon further examination, he noticed that there were notches or serrations on the valve pin, which he said resulted from "rough machining." These serrations caught on the bridge of the valve core, preventing the pin from moving up when the torch head was removed and causing the valve to stick open. He concluded in his initial report, therefore, that the cause of the accident was a defect in the valve, namely the serrations on the pin.

Approximately one month prior to trial Mr. Austin reexamined the valve core. At that time he had additional information concerning the manufacture of the valve, as well as a drawing and specifications of the valve which were obtained during discovery. After comparing the valve to the specifications and drawings, Mr. Austin determined that the bridge of the valve core was deformed, and that this deformation altered the diameter of the hole in the bridge through which the pin moves. It was Mr. Austin's opinion, based upon comparisons of measurements of the torch head probe and the deformed bridge, that the bridge deformation resulted from interference between the valve and the torch

head, and that the torch head pushed the bridge down when the torch head was attached to the canister. He also testified that there were no marks on the torch head probe which would indicate that it had been improperly extended or lengthened. From this, Mr. Austin concluded that the valve core was improperly placed in the canister without adequate clearance for the torch head. When a standard size torch head assembly was applied to the canister, the torch head probe would come into contact with the bridge with sufficient force to deform the bridge. The deformation in the bridge would, in turn, alter the diameter of the bridge hole causing the valve pin to catch on the bridge at the serrations. He also testified that this condition, *i.e.*, the inadequate clearance for the torch head probe, occurred at the time of manufacture of the canister.

The plaintiffs also read into evidence portions of depositions taken from employees of Coleman and Eaton and then rested their case. Mr. Wilbur Townsend, an employee of Coleman, testified that Coleman canisters were designed to accept appliances made by manufacturers other than Coleman. He also testified that on the few occasions that he had seen a damaged valve bridge, the damage had been the result of an appliance probe being too long. In thoses cases, there were usually marks on the probe indicating that the probe had been removed or improperly extended. However, after examining the Sears torch head used by Mr. Wright, he concluded that there was no evidence that the probe had been altered or extended. Mr. Townsend also stated that the Sears torch head probe was actually shorter than probes manufactured by Coleman. Finally, Mr. Townsend stated that the same damage to the bridge would result if the valve core were placed too high in the canister body as would result if the valve core were properly placed but the torch head probe was too long. Roger Nese, an employee of Eaton, testified by way of deposition, that the serrations on the valve pin are a natural and necessary by-product of the manufacturing process, caused when the pin is held by machine in order to place a head on the top of the pin.

At the close of the plaintiffs' case, Coleman produced only one witness who testified that Gerett produced canisters under contract with Coleman. Gerett attaches a Coleman label to the canisters and ships them directly to Coleman customers as instructed by Coleman. The contract between Coleman and Gerett, which includes an indemnification clause, was introduced into evidence.

Gerett then produced three employees involved in the manufacturing and testing of propane canisters. The first of these witnesses, Donald Hoffman, described in detail the quality control procedures used in testing completed propane canisters. He testified that there are specific tests to assure that the valve core is seated in the canister at the proper depth. He also testified that if a valve core were set too high in a canister, it would be crushed by the machine which fills the canisters with propane and would leak immediately. On cross-examination by Eaton, he stated that in his nineteen years of experience, he had never seen a valve core with a damaged bridge go through the assembling process.

The next witness was Richard Bowman, an engineer. Mr. Bowman was generally critical of Mr. Austin's testing methods and his conclusions. Bowman advanced the theory that the bridge was damaged not by any defect in the valve or the canister as assembled, but rather that the probe on the Sears torch head had been extended and was too long to fit properly. Thus, although he agreed with Austin that the reason that the valve stuck was the crushed bridge, he differed with Austin as to why the bridge was damaged. Mr. Bowman also concurred with Donald Hoffman that a canister with a valve core set too high would not come through the manufacturing process. This was due to the fact that if the valve core were not screwed into the valve body fully, there would be no seal between the valve core and the canister body, thus allowing the gas to escape. However, on cross-examination, he did state that there was a point where the valve core could be set too high in the canister but a seal still would be maintained. Significantly, Mr. Bowman

testified that the serrations on the valve pin are normal and appeared on every valve which he has seen.

At the close of Gerett's case, Eaton made a motion to dismiss as to the fourth party declaration, arguing, *inter alia,* that Gerett had failed to establish any breach of warranty by Eaton. The motion was denied. Eaton presented no witnesses but read into evidence answers to interrogatories propounded to Gerett relating to Gerett's inspection procedures. Eaton then rested.

(1)

*Wright v. Coleman*
*Fusco v. Coleman*

Coleman [2] has appealed from the judgment on the ground that the plaintiffs have failed to produce evidence sufficient either to satisfy the elements of strict liability as set forth by this Court in *Phipps v. General Motors Corp., supra,* 278 Md. 337, or the elements to establish a breach of implied warranty, Maryland Code (1975), § 2-314 of the Commercial Law Article. The thrust of Coleman's argument is that under either theory, the plaintiffs have failed to establish the exact nature of the defect and are therefore precluded from recovery.

In *Phipps v. General Motors Corp., supra,* 278 Md. at 344, we stated that the essential elements of an action in strict liability, as set forth in the Restatement (Second) of Torts § 402A (1965), are as follows:

> "For recovery, it must be established that (1) the product was in a defective condition at the time that it left the possession or control of the seller, (2)

---

**2.** Although Gerett has appealed from the judgment entered against it in favor of Coleman based on its indemnification agreement with Coleman, it conceded for purposes of this appeal that it is obligated to indemnify Coleman for the amount of any judgment entered against Coleman in favor of the plaintiffs. While Gerett did not assume the defense of Coleman at trial, *see* § 2-607 (5) (a) of the Maryland Uniform Commercial Code, it has, both below and on appeal, maintained that Coleman is not liable to the plaintiffs and has filed a joint brief with Coleman on this appeal. *See* Maryland Rule 315 c 2.

> that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition."

We explained that, in order for a seller to be held liable under the doctrine of strict liability, "the product must be both in a 'defective condition' and 'unreasonably dangerous' at the time that it is placed on the market by the seller." *Ibid.*

The plaintiffs in this case, by their own testimony, presented sufficient evidence to support the judgments in their favor based on the theory of strict liability. Their testimony shows that the canister was used within one hour of purchase, without any unusual handling or alterations, and according to the instructions on the label. A standard torch head, which the canister was designed to accept, was used in conjunction with the canister. When the torch head was removed from the canister, as recommended by the manufacturer, highly flammable gas continued to be released from the canister. There can be little doubt that a propane canister, used immediately after purchase according to instructions on the label, which continues to allow gas to be released after an appliance has been removed, is defective and unreasonably dangerous. Under circumstances such as these, the plaintiffs presented a prima facie case. There was no necessity for them to show more concerning the precise nature of the defect. *See Phipps v. General Motors Corp., supra,* 278 Md. at 345-346; *Giant Food, Inc. v. Wash. Coca-Cola,* 273 Md. 592, 609, 332 A. 2d 1 (1975); Powell and Hill, *Proof of a Defect or Defectiveness,* 5 U. Balt. L. Rev. 77, 89-90 (1975). Moreover, the existence of the defective condition, and its nature, was shown by the testimony of the plaintiffs' expert witness, Mr. Austin.

Also, we think that it could be reasonably inferred from these facts that the canister was in the defective condition and unreasonably dangerous when sold by Coleman to the retailer. There has been no allegation by any party that the

defective condition of the canister was, or could have been, caused by handling of the product by the retailer. *Compare Giant Food, Inc. v. Wash. Coca-Cola, supra,* where there was such evidence that the defective condition of the product was caused by handling of the retailer. Although Gerett did attempt to prove that the defective condition was caused by consumer misuse, that is, using the canister with a torch head probe which had been improperly extended or otherwise altered by the plaintiffs, there was conflicting evidence on this question. As previously pointed out, the testimony of the plaintiffs themselves supported an inference of no consumer misuse. Moreover, the testimony of Austin and of a Coleman employee rebutted the contention that the probe had been lengthened.

In sum, the trial court's finding that the canister was defective and unreasonably dangerous when it was placed on the market by Coleman is not clearly erroneous. Maryland Rule 886.

For these reasons, we shall affirm the judgment in favor of Wright and Fusco against the Coleman Company, Inc., and the judgment in favor of Coleman against M. A. Gerett, Inc.

### (2)

### *Gerett v. Eaton*

Gerett, as a fourth-party plaintiff, brought a breach of warranty action against Eaton, claiming that the valve core sold by Eaton was defective. Eaton, while denying that the valve core was defective, also interposed several defenses to the warranty action including the defense that Gerett had failed to notify Eaton prior to filing the fourth-party declaration of any breach of warranty as required by § 2-607 (3) (a) of the Maryland Uniform Commercial Code. Because we conclude that Gerett has failed to establish a prima facie case that Eaton breached its implied warranty of merchantability, it is not necessary for us to decide whether an intermediate seller who is sued for breach of warranty in a personal injury action is required to notify his

seller of the alleged breach of warranty prior to the bringing of suit. *See Frericks v. General Motors Corp.*, 278 Md. 304, 310 n. 2, 363 A. 2d 460 (1976).

Under § 2-314 of the Maryland Uniform Commercial Code, unless excluded or modified, the seller of goods warrants that "the goods shall be merchantable." Subsection (2) (c) of § 2-314 provides that to be merchantable, the goods must be "fit for the ordinary purposes for which such goods are used." *See Mattos, Inc. v. Hash*, 279 Md. 371, 379-381, 368 A. 2d 993 (1977); *Erdman v. Johnson Brothers*, 260 Md. 190, 194, 271 A. 2d 744 (1970). The trial court found that there was some unspecified defect in the valve sold by Eaton and therefore a breach of implied warranty. It is Gerett's position on this appeal that the defect consisted of the serrations on the valve pin which caught on the bridge of the valve core. As previously noted, this Court will not set aside a judgment of the lower court sitting without a jury on the evidence unless clearly erroneous. Rule 886. However, from a review of the record in this case, we must conclude that there was legally insufficient evidence to support the finding that the valve core was defective when delivered to Gerett by Eaton, and that, therefore, the finding was in error.

The plaintiff in a breach of warranty action has the burden of proving that the warranty was breached. *Mattos, Inc. v. Hash, supra; Giant Food, Inc. v. Wash. Coca-Cola, supra.* Gerett, in this case, simply failed to present any evidence that the valve core as delivered by Eaton was not fit for the ordinary purposes for which it was used. Gerett's own experts agreed with Mr. Austin that the pin caught on the bridge because the bridge had been crushed, resulting in the diameter of the hole through which the pin travels being altered. They disagreed with Austin as to the cause of the bridge deformation, and attempted to prove that it was caused by consumer misuse. However, even one of Gerett's own experts testified that the cause of the pin sticking in the open position was the damaged bridge and that the serrations on the pin were a normal by-product of the manufacturing process and were present on all valve pins manufactured by Eaton. There was no suggestion that these

serrations constituted a design defect or that the valve would not operate properly in the absence of damage to the bridge. The evidence further disclosed that the cause of the bridge damage was the improper placement by Gerett of the valve core in the canister. Absent any evidence that the pin would have remained down if the bridge were not damaged, or that the bridge was damaged when the valve was sold to Gerett, Gerett has simply failed to meet its burden of proving a breach of warranty. We therefore hold that the trial court's determination that the valve was defective when delivered to Gerett was in error. Consequently, the judgment in favor of M. A. Gerett, Inc., against Eaton Corporation must be reversed.[3]

> *Judgment in favor of Ronald J. Wright affirmed.*
>
> *Judgment in favor of Anthony Fusco affirmed.*
>
> *Judgment in favor of Coleman Company, Inc. affirmed.*
>
> *Judgment in favor of M. A. Gerett, Inc. reversed, and case remanded to the Circuit Court for Prince George's County for entry of a judgment in favor of Eaton Corporation.*
>
> *Costs to be paid by M. A. Gerett, Inc.*

---

**3.** While the plaintiffs' action sounded both in warranty and in tort, Gerett's fourth-party declaration appeared to be based solely on the theory of breach of warranty. However, even if Gerett had relied upon a theory of indemnification under the doctrine of strict liability in tort, our conclusion would be no different, as proof that the valve was defective when delivered to Gerett would still be required in the tort action as well as in a warranty action. *See, e.g.,* Liberty Mut. Ins. Co. v. Williams Machine & Tool Co., 62 Ill. 2d 77, 338 N.E.2d 857 (1975); Newmark v. Gimbel's Incorporated, 54 N. J. 585, 258 A. 2d 697, 705 (1969).