**In re DOCTORS HEALTH, INC., Debtor.**

**Bankruptcy No. 98–6–6211–JFS.**

United States Bankruptcy Court,
D. Maryland,
Baltimore Division.

Aug. 31, 1999.

Gregory Cross, Venable, Baetjer, and Howard, LLP, Baltimore, MD, for Debtor.

Eric G. Waxman, III, Phillips Nizer Benjamin Krim & Ballon LLP, James Seery, Jr., Garden City, NY, for United Healthcare.

John Leo Walter, Leitess, Leitess & Friedberg, P.C., Baltimore, MD, for IVTx, Inc.

Karen H. Moore, Baltimore, MD, Assistant U.S. Trustee.

### DECISION RE MOTION OF UNITED HEALTHCARE FOR RELIEF FROM AUTOMATIC STAY

S. MARTIN TEEL, Jr., Bankruptcy Judge.

This decision addresses a motion filed by United HealthCare of the Mid–Atlantic ("United") for relief from the automatic stay of 11 U.S.C. § 362(a). United is a health maintenance organization ("HMO") which contracted with the debtor, Doctors Health, Inc., for the debtor to furnish medical services on behalf of United's members electing to use the debtor.[1] United maintains that certain funds of the debtor ("the reserve") constitute a segregated fund which a Maryland health care statute requires United to distribute to intended beneficiaries—various "external providers" (a term defined in the contract and discussed below), who acted on the debtor's behalf to provide services to United's members. United's motion seeks relief from the automatic stay to permit United to administer external provider claims under the contract and to pay external provider claims from the reserve. United's motion is based on 11 U.S.C. § 362(d)(1) for cause and based on 11 U.S.C. § 362(d)(2) for lack of equity and lack of necessity of the property for an effective

---

1. The parties to the contract were Chesapeake Health Plan, Inc., and the debtor. Chesapeake Health Plan, Inc., subsequently changed its name to United HealthCare of the Mid–Atlantic, Inc. The court will treat both entities as one and the same.

reorganization. The motion will be granted on the basis of § 362(d)(1).

I

The court first addresses some of the basic contractual background of this dispute before turning to the HMO regulatory background and the specific events that led to this motion. The debtor and United entered into the contract at issue, entitled IPA Percentage of Premium Service Agreement ("the Agreement"), on June 1, 1996.[2] The critical part of the Agreement is § 3.2, which required the reserve to be established. But to understand § 3.2, it is first necessary to describe the relationship between the parties under the Agreement.

Under the Agreement, the debtor was designated as "IPA" (meaning an independent practice association). United, as an HMO, provides prepaid health care benefits to member patients through a coordinated system of arrangements with various health care providers. Agreement at 1.

As IPA, the debtor agreed "to provide or arrange for the provision of health services to the Members of the HMO [*i.e.,* United]." *Id.* The debtor specifically agreed to "provide or arrange for all those physician services as required in this Agreement." *Id.* § 3.1.7.

In exchange for its services, the debtor was entitled to a monthly capitation fee, a fixed amount for each United member who selected the debtor to provide health care.[3] The capitation payment was to be made on the tenth day of each month (or the next business day if the tenth day was a weekend or holiday). *Id.* § 3.1.2. The debtor maintains that the debtor itself employed no doctors to furnish services to United's members. Instead, it entered into contracts with physicians to provide services to United's members who had selected the debtor to provide services. These physicians qualified as "external providers" under Agreement § 1.8:

1.8 *External Providers* —means any physician, health professional, or other health care provider, including IPA Physicians, Health Service Contractors, and Health Centers contracted with IPA to provide Covered Services to all Members of the HMO.[4]

The debtor was required to "promptly and fully pay all External Providers who provide Medical Services to Members which were arranged or referred by IPA." *Id.* § 3.6.1. The debtor was required to "pay an External Provider providing services to all Members no later than thirty (30) days after receipt of a complete and undisputed claim for Medical Services, unless a longer period of time has been agreed to by HMO." *Id.* United was granted the right to contact external providers directly to verify whether the debtor was current in its payment to them. *Id.* § 3.6.2 The debtor was required to certify to United on a quarterly basis as to its payments to External Providers. *Id.* §§ 3.6.2 and 5.8.

Under Agreement § 5.9.4, "External Providers will look solely to the IPA for compensation for Covered Services provid-

---

2. The Agreement was amended in January 1998, and the court's reference to the Agreement includes those amendments.

3. The capitation payment was not to vary "[r]egardless of the number of External Providers rendering service to a member during any month ... [and] regardless of the type or amount of service rendered to the Member during a given month." Agreement § 3.1.7.

4. In turn, Agreement § 1.11 provided:
 *IPA Physician* —means a duly licensed doctor of medicine or osteopathy who prac-

tices in the Health Centers(s) and who has by contract agreed with IPA to provide certain health care services or is otherwise bound by the terms of such contracts as IPA may enter into to arrange for the provision of health care services.
The term "Health Center" meant one of the centers listed in the Agreement that were "operated by IPA for the provision of certain outpatient health care services to Members pursuant to this Agreement." Agreement § 1.10.

ed to Members, except for any approved and applicable copayments, coinsurance or deductibles to be collected by the External Providers." But Agreement § 5.11 provided:

> 5.11 *Payment of Claims.* Notwithstanding any other provision in this Agreement to the contrary, in instances where patient care, the reputation of the HMO, and/or the relationship between HMO and its Members is jeopardized by the IPA's nonpayment or late payment to subcontractors or providers for services provided to HMO enrollees, *HMO shall have the right to make these payments directly to the subcontractor provider and to recover from the IPA the full amount of any such payments as outlined under Section 3.2.* In order to exercise its rights, HMO must give IPA ten (10) days prior notice of HMO's intention to pay the subcontractor or provider directly.

[Emphasis added.]

In addition to rights against the reserve under § 3.2, United was granted rights of indemnification:

> 2.3 *Indemnification.* IPA shall indemnify and hold HMO ... harmless from any and all claims ... and liabilities incurred as a result of the services provided ... by IPA or IPA's employees, agents or subcontractors pursuant to this Agreement.

*Id.* § 2.3.

That brings the court to Agreement § 3.2:

> 3.2 *Reserve.* [sic] Pursuant to Maryland Health–General 19–713.2, upon contract signature IPA shall provide HMO with reasonably acceptable collateral to secure an amount equal to the immediately preceeding [sic] sixty (60) days of IPA capitation. The purpose of such Reserve is to ensure that sufficient funds are on hand to reimburse HMO for any payment made to External Providers, as required by law, if IPA fails to

make any such payments. HMO agrees that a Standby Letter of Credit from a commercial bank shall be deemed reasonably acceptable collateral for such purposes.

The Agreement was subject to the approval of the Maryland Insurance Administration. *Id.* § 7.18. Actually, as will be seen, Maryland law requires approval (via non-disapproval within 30 days of filing) of the plan incorporated in the Agreement. (The debtor does not contend that approval of the Agreement itself had to be obtained for it to be effective.) Approval of a form of plan, substantially similar to the plan the Agreement embodied, had been received earlier. But the form of agreement filed for approval included a provision—which the actual Agreement did not include—for withholding ten percent of the capitation payments to fund the reserve.[5] However, the Agreement in § 3.2 called for a reserve equal to 60 days of capitation or roughly one-sixth of yearly capitation; that amount exceeds 10 percent. In any event, the parties agree that the Maryland Insurance Commissioner requires that four areas of the form submitted for approval not be modified, but the reserve requirement is not one of those areas.

The Agreement required that all amendments to the Agreement be in writing. Agreement § 7.6. There were one or two amendments, depending on whether amendments are limited to documents altering, as opposed to merely supplementing, the terms of the original Agreement.

First, a "Letter of Agreement," dated April 15, 1997, supplemented the terms of the Agreement by providing in relevant part:

> The parties further agree that, in satisfaction of the requirements of Section 3.2 of said Agreement, DHS [*i.e.,* the debtor] has purchased a Certificate of Deposit in the amount of Six Hundred and Thirty Thousand Dollars ($630,000), *which amount may [be] adjusted from*

---

**5.** Tr. at 73–76, 102–04.

*time to time, to be used by UHC [i.e.,
United] for reimbursement in the event
that DHS fails to pay its subcontracting
physicians and UHC makes such payments for DHS.*

The parties further agree that, in the event UHC makes such payments on behalf of DHS, thus necessitating the use of the Certificate of Deposit for reimbursement, in whole, or in part, UHC shall notify DHS in writing of such intent at least three (3) business days prior. In addition, UHC shall submit to DHS a list of physicians paid on behalf of DHS and the amounts paid to each such physician.

[Emphasis added.]

Second, a more formal amendment to the Agreement was entered into on January 1, 1998, which altered provisions of the original Agreement. Entitled "Amendment # 1," this amendment altered § 3.1.1 of the Agreement to provide:

> 3.1.1 Subject to the provisions of Section 3.2, the HMO will pay to the IPA a monthly payment for each Medicare Member selecting the IPA as set forth in Attachment I.[6]

## II

This brings the court to § 19–713.2 of the Maryland Health Maintenance Organization Act ("HMO Act"),[7] which is referenced in § 3.2 of the Agreement. This statute applies only in the case of an "administrative service provider contract," defined as

> a contract or capitation agreement between a health maintenance organization and a contracting provider which includes requirements that:

> (i) The contracting provider accept payments from a health maintenance organization for health care services to be provided to members of the health maintenance organization that the contracting provider arranges to be provided by external providers; and

> (ii) The contracting provider administer payments pursuant to the contract within the health maintenance organization for the health care services to the external providers.

HMO Act § 19–713.2(a)(2). In turn, "contracting provider" is defined as "a physician or other health care provider who enters into an administrative service provider contract with a health maintenance organization." *Id.* § 19–713.2(a)(3). The term "external provider" is defined as a health care provider, including a physician or hospital, who is not:

> (i) A contracting provider; or

> (ii) An employee, shareholder, or partner of a contracting provider.

*Id.* § 19–713.2(a)(4). An HMO cannot enter into an administrative service provider contract unless (1) the HMO files with the State Insurance Commissioner a plan satisfying § 19–713.2(c) and (2) the Insurance Commissioner does not disapprove the filing within 30 days after the plan is filed. *Id.* § 19–713.2(b).

 The court then turns to § 19–713.2(c). This provision, as a whole, makes clear that Maryland's focus in enacting the statute was to enhance the likelihood of external providers being paid for services rendered on behalf of contracting providers such as the debtor here, and specifically includes (in paragraph (3)) the requirement of a reserve or similar device

---

**6.** Prior to the January 1998 amendment, § 3.1.1 provided:

> 3.1.1 Subject to the provisions of Section 3.2 regarding withholds, the HMO will pay to the IPA a monthly capitation payment for each Non–MA Member selecting the IPA as set forth in Attachment G, for each MA Member as set forth in Attachment H and for each Medicare Member as set forth in Attachment I.

The term "withholds" is not used in § 3.2, nor is it used elsewhere in the Agreement.

**7.** The HMO Act is subtitle 7 to Md.Code Ann., Health–General. *See* HMO Act § 19–734 ("Short Title").

for the protection of such external providers. In full, § 19–713.2(c) provides:

(c) *Plan requirements.*—The plan required under subsection (b) of this section shall:

(1) Require the contracting provider to provide the health maintenance organization with regular reports, at least quarterly, that identify payments made or owed to external providers in sufficient detail to determine if the payments are being made in compliance with law;

(2) Require the contracting provider to provide to the health maintenance organization a current annual financial statement of the contracting provider each year;

(3) Require the creation by the contracting provider, or on the contracting provider's behalf, of a segregated fund (which may include withheld funds, escrow accounts, letters of credit, or similar arrangements), or require the availability of other resources that are sufficient to satisfy the contracting provider's obligations to external providers for services rendered to members of the health maintenance organization;

(4) Require an explanation of how the fund or resources required under paragraph (3) of this subsection create funds or other resources sufficient to satisfy the contracting provider's obligations to external providers for services rendered to members of the health maintenance organization; and

(5) Permit the health maintenance organization, at mutually agreed upon times and upon reasonable prior notice, to audit and inspect the contracting provider's books, records, and operations relevant to the provider's

contract for the purpose of determining the contracting provider's compliance with the plan.

The statute then requires both the HMO and the contracting provider to comply with the plan (§ 19–713.2(d)); requires the HMO to monitor the contracting provider's compliance with the plan and to notify the contracting provider of any failure to comply with the plan (§ 19–713.2(e)(1)); and finally provides:

Upon the failure of the contracting provider to comply with the plan following notice of noncompliance, or upon termination of the administrative service provider contract for any reason, the health maintenance organization shall assume the administration of any payments due from the contracting provider to external providers on behalf of the contracting provider.

*Id.* § 19–713.2(e)(2).

Under HMO Act § 19–712(b)(1), an HMO that

enters into any administrative service provider contract, as defined in § 19–713.1[sic] [8] of this subtitle, with a person or entity for the provision of health care services to subscribers shall be responsible for all claims or payments for health care services:

(i) Covered under the subscriber's contract; and

(ii) Rendered by a provider, who is not the person or entity which entered into the administrative service provider contract with the health maintenance organization, pursuant to a referral by a person or entity which entered into the administrative service provider contract with the health maintenance organization.[9]

---

8. The reference plainly should have been to § 19–713.2 instead, for § 19–713.1 has nothing to do with administrative service provider contracts.

9. In turn, § 19–712(b)(2) provides that the responsibility for claims or payments arising from § 19–712(b)(1) is subject to § 19–712.1, which provides time limitations and interest provisions regarding an HMO's reimbursement of providers.

### III

The Agreement was terminated by the debtor's letter of June 9, 1998. The parties agree that the termination was effective August 31, 1998.[10] Shortly before July 6, 1998, Sharon C. Pavlos, a vice president of United, telephoned Beth A. Beale of the debtor to discuss, among other things, the necessity of the reserve being brought to $2 million, which was the equivalent of the prior two months' capitation as required by the contract. On July 6, 1998, Pavlos wrote Beale, advising in relevant part:

> The second issue involves the satisfaction of the reserve requirement as set forth in our contract. As I advised you on the telephone, the reserve needs to be at approximately $2 million. We currently have a copy of a $630,000 CD on deposit at First National Bank of Maryland. However, the CD terminates on July 13, 1998. In order to consider this instrument as a valid security against this contract, we need to see evidence that the CD was rolled over and extended for another quarter and placed with a mutually agreed upon trustee with specific, agreed upon pay orders attached. Assuming this security maintains its validity with us, please advise on how you would like to make up the additional security reserve to satisfy the contractual requirement. *Until you advise on this issue, we will be withholding capitation equal to the reserve requirement.*

[Emphasis added.] As Pavlos testified at trial, the debtor was "in breach of contract at that point, by not maintaining an adequate reserve. So, we were going to exercise some self-help and just withhold the capitation." Tr. at 87.

When she had not heard from United after July 6, 1998, Pavlos attempted to reach John Dwyer, the Chief Financial Officer of the debtor by telephone. Eventually, he telephoned her and told her that the debtor had no problem with United's withholding the capitation payments to permit the debtor to meet the $2 million reserve requirement under § 3.2 of the Agreement. On the other hand, United agreed that it would let the $630,000 CD terminate. The debtor received the proceeds of the $630,000 CD.

United has entered into no contracts directly to pay any of the external providers. No evidence exists that United paid any of the external providers prior to the termination of the Agreement on August 31, 1998.

United proceeded to withhold $1,930,828 from the July and August 1998 capitation payments owed the debtor. By a letter of July 9, 1998, United advised the debtor that the July 1998 capitation payment of $977,244.00 was being held by United towards satisfaction of a reserve amount of $2 million as detailed in Pavlos's July 6, 1998 letter. By a letter of August 4, 1998, United advised the debtor that the August 1998 capitation payment of $953,584.00 was being held by United towards satisfaction of the $2 million reserve requirement. The total of the two withheld sums equals the $1,930,828 figure.

United has placed the money in a bank account without establishing a separate bank account. But United has separately listed the $1,930,828 on its books.

On September 4, 1998, the debtor's Beale wrote United's Pavlos, advising:

> Since the capitation withheld was for the purpose of claims run out, we would propose that Doctors Health process the open claims and provide United Health-Care with a weekly claims summary report and cash requirement. We request that United HealthCare release funds to Doctors Health in the amount of the cash requirement to pay the adjudicated claims. If United prefers to cut the checks directly to the vendors, Doctors Health is willing to provide the explanation of benefits to accompany payment. If this is not acceptable to United

---

10. Tr. at 83.

HealthCare, Doctors Health has no alternative but to send all claims received after August 31, 1998 to United for processing and payment.

The debtor filed its petition under chapter 11 of the Bankruptcy Code on November 16, 1998.

## IV

### A. *Issues*

The debtor raised several arguments in an effort to defeat United's motion. The debtor contends that HMO Act § 19–713.2 does not apply to the debtor (so that it has no effect in applying the Agreement). The debtor contends, alternatively, that if § 19–713.2 does apply, the reserve (if properly withheld by United) nevertheless is not intended to be held for the benefit of external providers because the statute is too vague to create a trust. Next, the debtor contends that the reserve was improperly withheld by United in violation of the Agreement. Finally, the debtor raises bankruptcy arguments that no relief is justified under 11 U.S.C. § 362(d).

More specifically, the issues the motion presents are:

1. Does HMO Act § 19–713.2 apply, by the terms of the Act, to the debtor?

2. If not, does the Agreement nevertheless operate as though HMO Act § 19–713.2 applies to the debtor?

3. Did the Agreement make the reserve a segregated fund to be held in trust to pay external providers?

4. Did the termination of the Agreement terminate the effectiveness of the reserve?

5. Is United estopped from asserting its right to a reserve equal to two months of capitation by reason of a waiver of that right at an earlier stage?

6. Did United act in conformance with the Agreement when it placed capitation payments owed the debtor in the reserve?

7. Alternatively, does United have a right of setoff or recoupment justifying its continued withholding of capitation payments?

8. Do the Bankruptcy Code's distribution provisions preempt the provisions of HMO Act § 19–713.2 and the Agreement's incorporation of those provisions? Does 28 U.S.C. § 959(b) instead require allowing United to proceed under HMO Act § 19–713.2?

9. Does cause exist to grant relief from the automatic stay to permit United to pay external provider claims from the reserve?

10. Has United shown that there is no equity in the reserve?

### B. *Analysis of Issues*

1. *Applicability of HMO Act § 19–713.2 to the Debtor.* The debtor argues that HMO Act § 19–713.2 does not apply to the debtor, such that United cannot bring § 19–713.2 to bear on the enforcement of the Agreement. HMO Act § 19–713.2 applies only in the case of an "administrative service provider contract" between an HMO and a "contracting provider." By definition, a "contracting provider" must be "a physician or other health care provider." HMO Act § 19–713.2(a)(3). The term "provider" is defined earlier in HMO Act § 19–701(h) as meaning "any person, including a physician or hospital, who is licensed or otherwise authorized in this State to provide health care services."

The debtor did not employ any physicians to provide medical services. The debtor points to its lack of a license and argues that it did not otherwise have authorization to provide health care services in Maryland. Hence, it argues, it was not a "provider" and thus could not be a "contracting provider."

But the fallacy in the debtor's argument is its erroneous assumption that it was not authorized to serve as a health care provider via an administrative service

provider contract. An HMO cannot enter into an administrative service provider contract without a plan pre-authorized by the Insurance Commissioner (through failure to disapprove timely). *Id.* § 19–713.2(b). Accordingly, authorization of the plan precedes entry into the contract.

■ Although the statute is poorly drafted, the HMO Act's definition of "provider" should be read as including an entity, such as the debtor, that enters into an administrative service provider contract pursuant to a pre-approved plan that imposes no requirement that it already be a "provider." The Insurance Commissioner's failure to disapprove the plan filed under § 19–713.2(b) authorized United to enter into administrative service provider contracts embodying the plan. Here, the form of plan United filed for approval did not require that the IPA already be a provider as defined under § 19–701(h). The approval of the plan authorized the debtor—even if it would not qualify as a provider outside of the Agreement—to provide health care services through the use of external providers. The debtor became a health care provider by the use of such external providers.

This is the natural reading of the statute. In addition, there is no evidence that

Maryland legislators intended that an entity such as the debtor could not function as a "contracting provider" simply because the entity did not itself directly provide health care services. By contracting with providers to furnish health care services, pursuant to a contract with an HMO embodying a plan duly authorized under § 19–713.2(b), the debtor became a health care provider—an entity authorized to provide health care through such external providers.[11] It thus fits within the definition of "provider" by reason of being "otherwise authorized" to provide health care services in Maryland within the meaning of § 19–701(h).[12]

■ 2. *Incorporation of HMO Act § 19–713.2 by the Agreement.* Even if the debtor were not a "provider" under the HMO Act, such that HMO Act § 19–713.2 would not apply of its own force to the debtor, the Agreement plainly intended the debtor to be subject to the provisions of § 19–713.2 as though that statute were applicable to it. The debtor itself so conceded in documents preceding this contested matter. *See* nn. 11 and 12.

Accordingly, in construing the Agreement, the court would treat the debtor as though it were an administrative service

**11.** The debtor acknowledged that by using external providers it became itself a health care provider: "The Company ... enters into Global Capitation Contracts with Payors to ... provide health care services to their enrollees through Doctors Health providers ...," a practice the debtor believed was "in strict accord with Maryland law." Debtor's Form 10–K filed with the Securities and Exchange Commission in November 1998 ("the debtor's Form 10–K") (United Ex. 2 at 8 and 15).

**12.** The debtor's Form 10–K filed in November 1998 the Form 10–K acknowledged that the court's interpretation of the HMO Act is correct:

In Maryland, licensed HMOs are permitted to enter into capitation arrangements with entities like the Company which assume the obligation to pay providers directly as long as the HMO has obtained approval for the form of the "administrative

service provider contract" with the entity.... All of the Company's Global Capitation Contracts are administrative service provider contracts with licensed HMOs.
United Ex. 2 at 14.

A similar acknowledgment occurred in a memorandum of October 1, 1998, in which the debtor listed affiliated providers "who must be excluded from initial payment from the United HealthCare reserve funds as required by Section 19–713.2(c)(3)."

Finally, in a letter of October 29, 1998, the debtor acknowledged that it "has acted as a subcontractor for United ... pursuant to the administrative service provider provisions of Section 19–713.2" and took the position that pursuant to § 19–713.2(e)(2), "United is required to assume 'the administration of any payments due from the contracting provider to external providers on behalf of the contracting provider.'"

provider even if the HMO Act did not apply of its own force.

■ 3. *Intention that the Reserve Would Be a Segregated Fund to be Used to Pay External Providers.* The debtor urges that HMO Act § 19–713.2(c)(3) does not create a trust on behalf of external providers. But in the circumstances of this case, the reserve was clearly intended to be held for the benefit of external providers. The debtor took this very position when it filed its Form 10–K:

> The Company is required under its Global Capitation Contracts to either post a letter of credit or create a segregated fund for the benefit of health care providers which provide services to enrollees under Global Capitation Contracts to which the Company is a party.

United Ex. 2 at 14.

If the reference in the Agreement to HMO Act § 19–713.2 were disregarded, it might be argued that the reserve was only intended as collateral securing United's right to indemnification. The Agreement (at § 3.2) required that

> [p]ursuant to … § 19.713.2, … [the debtor] shall provide HMO with reasonably acceptable collateral to secure an amount equal to the immediately preceding sixty (60) days of IPA capitation. The purpose of such Reserve is to ensure that sufficient funds are on hand to reimburse HMO for any payment made to External Providers, as required by law, if IPA fails to make any such payments.

Plainly United (the HMO) was to be secured by the reserve for any payments it made to external providers. Moreover, the Agreement (at § 3.2) referred to a standby letter of credit "upon such standard commercial terms and conditions as the Bank, HMO and IPA may agree" as reasonably acceptable collateral. This is adequate intention to create a security interest if the reserve was not to be held in trust for the benefit of external providers.

Nevertheless, the court holds that the Agreement's specific recitation that the reserve was being established under § 19–713.2 suffices to make the reserve a trust held for the benefit of the unpaid external providers. This overrides any possible view of the reserve as a security interest for United's indemnification rights.

HMO Act § 19–713.2(c)(3) required that any plan filed under § 19–713.2(b) shall "[r]equire the creation by the contracting provider, or on the contracting provider's behalf, of a segregated fund … or require the availability of other *resources that are sufficient to satisfy the contracting provider's obligations to external providers* for services rendered to members of the health maintenance organization." [Emphasis added.] Finally, under § 19.713.2(e)(2), the HMO is required "to assume the administration of any payments due from the contracting provider to external providers on behalf of the contracting provider."

The debtor urges that the requirement of "the availability of … resources … sufficient to satisfy the contracting provider's obligations to external providers" in § 19–713.2(c)(3) means that the contracting provider could simply set aside resources within its own organization that were sufficient to pay external providers. Nor, argues the debtor, does § 19.713.2(e)(2) contemplate that such resources become a trust for the benefit of external providers: under that provision, the HMO must assume the administration of payments, but § 19.713.2(e)(2) does not say what the source of payments shall be.

The court rejects the debtor's construction of the statute as a strained interpretation that defeats the statute's plain intention of affording protection to external providers. Once a fund is set aside under an administrative service provider contract for the protection of external providers, as occurred here, the fund is intended to be held "to satisfy the contracting provider's obligations to external providers for services rendered to members of the health

maintenance organization." HMO Act § 19–713.2(c)(3).

To treat the funds as not held in trust would defeat the statute's intention that the funds be a "segregated fund ... or other resources that are sufficient to satisfy the contracting provider's obligations to external providers." The focus of the statute is on satisfying the direct obligations of the contracting provider (here, the debtor) to the external providers. The sufficiency of the funds to pay the external providers would disappear if they were not truly segregated for the external providers' benefit.

Although the Agreement cast the reserve as collateral for United, the reference to § 19–713.2 evinces the true purpose of the reserve—to serve as a segregated fund for the protection of the external providers. While the external providers might fare just as well by looking to United's resources for payment, that would add nothing to their right already existing under § 19–712(b)(1)(ii) to seek payment from United. Clearly § 19–713.2 is intended to give an added protection to external providers beyond that which already exists under § 19–712(b)(1)(ii).

Concededly, granting United a security interest against the reserve would improve United's balance sheet, thereby indirectly improving the value of the external providers' rights under § 19–712(b)(1)(ii) to proceed against United. But that is not an enhancement that would furnish a direct source for satisfying the claims; nor would that enhancement guarantee full payment of the external providers if United is or were to become insolvent. In other words, the character of the reserve funds as "resources ... sufficient to satisfy the contracting provider's obligations to external providers" would be lost if the reserve is treated only as collateral for United because (1) the reserve would not be a resource to be used to satisfy the external providers' claims and (2) the right to proceed against United could prove insufficient to pay the external providers' claims if United is or were to become insolvent.[13] The court thus concludes that the reserve should be treated as held in trust for payment of the external providers' claims.

4. *Effect of Termination of Agreement on Reserve.* The Agreement was terminated on August 31, 1998. The debtor points to § 6.3.4 of the Agreement to argue that the Agreement's provisions regarding the reserve did not survive termination:

6.3.4 Notwithstanding anything herein to the contrary, the following provisions of this Agreement shall survive termination for whatever cause: Section 2.3 (Indemnification), 5.14 (Malpractice Insurance and Liability)[,] Section 3.6 (External Providers), Section 5.8 (Reporting Requirements) for reports as to any period prior to termination, Section 5.10 (Compensation from HMO Solely), Section 5.19 (Medical Records), and Section 5.21 (Inspection of Records and Operations).

Section 3.2, the section of the Agreement establishing the reserve, is not mentioned as one of the provisions expressly surviving termination of the Agreement. The debtor goes a step further and argues that § 5.11, the provision giving United the right to pay external providers if the debtor failed to do so, was similarly not a provision specifically mentioned as surviving by § 6.3.4. Accordingly, the debtor argues, §§ 3.2 and 5.11 do not survive the termination of the agreement: specification of those provisions that do survive indicates an intention that any provisions not mentioned do not survive. Without

---

**13.** The court neglected to inquire at the hearing on the motion why United had failed to pay the external providers' claims directly as required by § 19–712(b)(1)(ii). To the extent that United's failure stems from uncertainty over its own financial prospects, this would only heighten the court's view that the reserve should be treated as held in trust for the benefit of the external providers.

any right to pay external providers under § 5.11 being preserved by § 6.3.4, there would be no need for a reserve; and, in any event, the reserve provision of § 3.2 itself is similarly not preserved by § 6.3.4.

The debtor buttresses this argument by pointing to three exhibits in which it says United admitted that it no longer had an obligation to pay the external providers. However, the court does not read the exhibits as the debtor would. Instead, the three exhibits—a letter to an external provider,[14] a letter to the Insurance Commissioner,[15] and a letter to the debtor declining to release the reserve funds[16]—are consistent with the positions United has taken in this proceeding.

 The court readily rejects the debtor's termination argument: § 6.3.4 of the Agreement does not say that only the specified provisions survive termination. Because the reserve was intended to protect United in the event that the debtor terminated the Agreement without having paid external providers, it is evident that the reserve—a form of collateral placed in trust for the external providers—remained intact despite not being enumerated in § 6.3.4. Once granted to United, the reserve (established for the benefit of unpaid external providers) does not cease simply because the Agreement is terminated. "The provisions of a contract are enforceable, and a cause of action can be brought upon them, even after the expiration or termination of the agreement." *Booster Lodge No. 405 v. NLRB*, 459 F.2d 1143, 1152 (D.C.Cir.1972) (quoting decision of NLRB); *see Factory Realty Corp. v. Corbin–Holmes Shoe Co.*, 312 Mass. 325, 44 N.E.2d 671, 673 (1942) (overturning ruling "that the cancellation of the agreement put an end to all the covenants and liabilities thereunder as though the covenants never had existed"); *cf. Giant Food, Inc. v. Washington Coca–Cola Bottling Co.*, 273 Md. 592, 332 A.2d 1, 8 (1975) (quoting Uniform Commercial Code § 2–106(3) that on termination "all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives"). This is particularly the case because the reserve

14. In a letter of February 2, 1999, sent by United to an external provider, American Radiology Services, Inc., United observed that "all claims respecting pre-petition DHI [the debtor] contracts are subject to the provision[s] of the United States Bankruptcy Code and approval of the Bankruptcy Court." United, the debtor argues, was taking the position that United had no obligation to pay the external providers because payment was instead now the subject of the Bankruptcy Code. The court does not read the letter as going as far as the debtor urges. As this decision demonstrates, there were issues present which warranted United's seeking approval of the bankruptcy court before proceeding with respect to the reserve and payments to external providers.

15. United's December 11, 1998, letter to the Insurance Commissioner recited:

The Reserve should be available to satisfy obligations under the Capitation Agreement, including Doctors Health's obligations to external providers for services rendered to United HealthCare members, but use of the Reserve is subject to the provisions of the Bankruptcy Code.

But, in the same part of the letter, United described its efforts to secure an agreement regarding quantification and adjudication of provider claims and application of the reserve. It then observed that absent an agreement, it would consider relief from the automatic stay so that it "can implement a plan to administer payment to external providers." The court fails to see any disavowal of an obligation to pay the external providers. United, reasonably or not, was simply deferring paying the external providers directly, proceeding instead first to attempt to pay them from the reserve.

16. United's letter to the debtor dated September 24, 1998, recites:

United's position that under Maryland law the funds in the reserve account must first be used to satisfy all unpaid claims for those providers who rendered services to United members, but who are not considered a contracting provider or an employee, shareholder, or partner of a contracting provider. Once those claims have been satisfied, only then may the remaining funds be released to Doctor's Health.

There is no disavowal of an obligation to pay the external providers.

was intended to protect third parties, the unpaid external providers. *O'Hare v. Pursell,* 329 S.W.2d 614, 622 (Mo.1959) (holding that termination cannot extinguish non-assenting third-parties' rights that accrued prior to termination); *Sawyer v. Sunset Mut. Life Ins. Co.,* 8 Cal.2d 492, 66 P.2d 641, 644 (1937) (same).

Nothing in the Agreement suggests that the reserve rights were to expire. So there was no reason to provide, as in § 6.3.4, that notwithstanding anything to the contrary in the Agreement, the reserve provision survived.[17]

Similarly, § 5.11 would naturally survive as well: United's desire after termination to protect its reputation by paying external providers is no less diminished than before termination. Nothing in the Agreement suggests that United's rights under § 5.11 were to lapse after the arbitrary event of termination. Further, pursuant to HMO Act § 19–712(b)(1), United was responsible for paying the external providers.

United's rights under §§ 3.2 and 5.11 no more disappear than the debtor's right to claim against United for the unpaid capitation, a right not specifically mentioned in § 6.3.4.[18] Moreover, United's right of indemnification by the debtor under Agreement § 2.3 and the debtor's obligation to pay external providers under Agreement § 3.6 expressly survived under § 6.3.4. Taken in conjunction with HMO Act § 19–713.2, this further supports the proposition that United's rights under the reserve survived the termination of the Agreement.

■ 5. *Effect of United's Failure to Insist on Two Months of Capitation Until Just Before the Agreement was Terminated.* The debtor urges that United waived its right to a reserve by failing to enforce that right until the CD was established.[19] But Agreement § 7.13 provided:

> 7.13 *Waiver.* No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant hereto. Resort to one form of remedy shall not constitute a waiver of alternative remedies. Further, no waiver, express or implied, . . . shall constitute a waiver of any right under this Agreement or of any subsequent breach, whether of a similar or dissimilar nature.

This provision precludes the debtor's waiver argument.

■ 6. *United's Conformance with Agreement When it Withheld Two Months of Capitation.* The debtor urges that United had no right to engage in self-help

---

**17.** The debtor essentially argues that the Agreement should be interpreted as saying that "the debtor shall establish a reserve to reimburse United for payments made to external providers but the reserve shall terminate when the Agreement terminates even though United's desire (or obligation) to pay external providers has not terminated." The parties could not have intended such an absurd result.

**18.** The debtor also urges that the Letter Agreement of April 15, 1997, specifically provided:

> The parties agree that this Letter of Agreement shall remain in effect so long as the IPA Percentage of Premium Service Agreement (Agreement), effective June 1, 1996, between them shall be in full force and effect and shall terminate upon the termination of said Agreement.

This language is academic, however, because the $630,000 certificate of deposit ("CD") has matured and its proceeds retained by the debtor. The parties agreed that United would use the $1.9 million withheld capitation payments for the reserve and that the debtor would keep the $630,000 CD established by the Letter Agreement when the CD matured.

**19.** No reserve was on hand until the $630,000 CD was put in place in April 1997. That $630,000 was two months of capitation, based on January 1997 capitation. Due to increasing membership, the $630,000 proved inadequate after April 1997 to represent two months of capitation. No effort was made to correct the reserve by increasing its size until July and August of 1998, when United began to withhold capitation for purposes of the reserve.

and withhold two months of capitation as a reserve. But the Agreement (at § 3.1.1) stated that payment of capitation was always subject to the requirements of the reserve. The best the debtor can argue is that § 3.1.1 was ambiguous and that it did not allow unilateral withholdings because § 3.2 required the debtor to establish the reserve, not the other way around. However, whatever ambiguity existed was cleared up by the parties' oral agreement in August 1998 that the $630,000 CD would be released to the debtor and that United would withhold the two months of capitation. The debtor made no protest against United withholding the two months of capitation. Although the oral arrangement was not in writing (which would be required for an amendment of the Agreement under § 7.6) and although the Agreement was "the entire Agreement" under § 7.5, the oral arrangement is admissible to show that § 3.1.1 did indeed contemplate withholdings if the debtor failed otherwise to post a sufficient reserve.

In any event, even if unilateral withholding was not authorized by § 3.1.1, the Agreement did not require that the debtor's consent to any withholding be in writing. The debtor could "provide collateral" as required by § 3.2 by the simple expedient of orally consenting to United's withholding of capitation payments to serve as collateral, whether such consent was before or after the fact. There was no requirement in the Agreement that the act of providing collateral itself be in writing.

7. *United's Setoff and Recoupment Rights.* In light of the rulings above, the court finds it unnecessary to address whether United had a setoff or recoupment right even if it otherwise had no right to withhold the reserve.[20]

8. *Preemptive Effect, if any, of Bankruptcy Code.* The debtor urges that the Bankruptcy Code preempts United's rights under the Agreement and under HMO Act § 19–713.2, to wit, that the Bankruptcy Code bars United from paying external providers out of the reserve to the detriment of other claimants; that the Bankruptcy Code requires United to await the confirmation of a chapter 11 plan dealing with payment of creditors; and that the Bankruptcy Code requires adherence to its procedures for allowance of claims. An intervenor, IVTx, Inc., has filed a post-trial motion in which it urges that 28 U.S.C. § 959(b) requires the debtor to conduct its business in conformance with HMO Act § 19–713.2.

The court rejects the debtor's and the intervenor's arguments. The issue is not one of federal preemption, as the debtor urges, but of cause for granting relief from the stay despite the ordinary procedures under the Bankruptcy Code for adjudicating and paying claims. Nor does the court find 28 U.S.C. § 959(b) dispositive. The reserve is property of the estate (albeit only because of the residual interest the debtor may have in the reserve). The debtor is essentially in a liquidation mode. This is not a question regarding the conduct of business, but rather a question of the disposition of an asset in which the debtor has a residual interest. The court must turn to whether the trust nature of the reserve and other factors (including state law policies) warrant this court's granting United relief from the automatic stay to proceed to administer the reserve.

9. *Cause for Lifting the Automatic Stay.* When United's motion was tried,

---

**20.** Based on United's right to indemnification, intervenor IVTx, Inc., urges that United had a right of setoff or recoupment which permitted it to withhold the reserve funds even disregarding its rights under § 3.2. The debtor argues that United cannot place itself in a position of having a right of setoff or recoupment by taking actions that violated the Agreement. It also urges that there was no right of setoff because United had not paid any of the external providers and hence had no prepetition claim for indemnification that had sufficiently matured to give rise to a right of setoff or recoupment. These issues are simply moot.

the debtor had only five employees. In June 1998, the debtor had over 150 employees. It is now looking to sell any of its assets of value. If it recovered the $1.9 million held by United, the debtor argues, it would use the funds as part of a reorganization to compensate prepetition creditors and other entities with which it has dealt (presumably meaning the administrative claimants in the case). But the funds are not available for such a purpose: they are held in trust for the benefit of external providers.[21]

The debtor argues that it ought to have the right to process the claims to assure that improper claims are not paid. But United has employed an experienced claims processor (Ascendia Healthcare Management, the debtor's former claims processor) which should determine claims just as fairly as the debtor would. To evaluate the claims, the debtor would have to hire the same or a similar claims processor, at substantial administrative expense to the estate. The debtor has made no showing of a legitimate concern that United's claims processor would make a meaningfully less accurate determination of claims than would a processor hired by the debtor. Nor has the debtor articulated any reason why it cannot undertake any examination of potential defenses to external provider claims now (instead of later) to alert United of defenses which United would ignore at its own peril. Moreover, United has agreed that prior to any payments being made, "Ascendia will provide to United HealthCare, the Debtor, and the Maryland State Insurance Commissioner . . . a payment schedule and a proposed distribution to [the] claimholders." United Memorandum at 3. "The Debtor," United states, "will have an opportunity to review and comment upon these determinations before payment." *Id.* The court assumes that United will allow at least three weeks

for comment; the court's order granting relief from the stay will so provide.

If its motion is granted, United concedes that it must shoulder the expense of a claims processor. Any claim by United for reimbursement from the estate would be a general unsecured claim not entitled to any priority.

▪ The debtor's interest in the trust is slight, a technical potential that external provider claims might not exceed the reserve, thus leaving the debtor a residual sum. But based on the testimony of United's claims processor, it is unlikely that will occur. Assuming the claims are accurately determined, there would be no reason to stay distribution of the reserve to the entities unquestionably entitled to the funds: the debtor cannot justify tying up the reserve—which is only a fund, not some tangible piece of equipment the debtor could use to reorganize. *Cf. In re Olson,* 175 B.R. 30 (Bankr.D.Neb.1994) (upon establishing a right of setoff, creditor makes a prima facie showing of cause); *In re Whitaker,* 173 B.R. 359 (Bankr.S.D.Ohio 1994) (same). Moreover, as discussed above, the debtor has had and will have adequate opportunity to alert United to any defenses to payment of such claims. If United disregards an asserted defense, the debtor could seek injunctive relief at that juncture. But as already noted, there is no reason to believe that United's claims processor, Ascendia, will make any meaningfully less accurate assessment of claims than would a claims processor hired by the debtor. The fear of claims being paid from the reserve in derogation of the debtor's interests is largely a chimera.

In contrast to the debtor's interests, the external providers' interest in obtaining prompt payment as beneficiaries of the trust is substantial. The case has been

---

21. The debtor has not suggested that in the event of a shortfall in the reserve to pay the external providers, United would be unable to pay the deficiency from its own resources. Moreover, United contemplates paying the reserve on a pro rata basis. So there are no issues of staying administration of the fund to assure equality of treatment amongst the external providers.

pending for many months without the debtor undertaking a determination of claims. In the meantime, the external providers, the beneficiaries of the reserve held in trust, have not received payment from that trust.

In addition, HMO Act § 19–713.2 embodies substantial state concerns regarding the efficacious administration of health care programs. These concerns are an additional factor warranting finding cause for lifting the automatic stay under § 362(d)(1). *See Three Sisters Partners, L.L.C. v. Harden (In re Shangra–La, Inc.),* 167 F.3d 843, 851 n. 7 (4th Cir.1999) (under § 362(d)(1), "the bankruptcy court has an opportunity to evaluate the equities in the situation and the interplay between bankruptcy requirements and state law and can tailor relief accordingly"); *cf. Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 502, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (rejecting "a right to abandon property in contravention of state or local laws designed to protect public health or safety").

The court thus concludes that cause exists under 11 U.S.C. § 362(d)(1) to allow United to process the external provider claims and to pay them from the reserve.[22] *See United Jersey Bank v. CS Assocs. (In re CS Assocs.),* 121 B.R. 942, 958–60 (Bankr.E.D.Pa.1990).

■ 10. *Lack of Equity in the Reserve.* United did not carry its burden of proving a lack of equity under 11 U.S.C. § 362(d)(2)(A). Sufficient infirmities could exist in the external provider claims to result in a surplus existing in the reserve. However, it is doubtful that will happen. That is a factor which, as already discussed, supports granting relief for cause under § 362(d)(1). Because United failed to establish a lack of equity and because

§ 362(d)(1) relief is being granted, it becomes unnecessary to address whether the reserve is necessary for an effective reorganization under § 362(d)(2)(B).

---

**22.** Even if a mere security interest to cover United's indemnification rights were present (rather than a trust), the court would likely reach the same result. To the extent of any indemnification claim, the funds would simply not be of any value to the estate. And the factors justifying letting United proceed to determine claims and pay out the reserve as a trust would apply as well to allowing it to enforce its security interest for indemnification. So § 362(d)(1) would be satisfied.